936 P.2d 643

George H. FURUKAWA, Plaintiff–Appellant/Cross–Appellee,

v.

HONOLULU ZOOLOGICAL SOCIETY, Defendant–Appellee/Cross–Appellant,

and

John Does 1 to 10, and Jane Does 1 to 10, Defendants.

No. 18735.

Supreme Court of Hawai'i.

April 9, 1997.

Reconsideration Denied May 6, 1997.

Clayton C. Ikei and April Wilson–South, Honolulu, for plaintiff-appellant.

Lynne T. Toyofuku (Barbara A. Petrus with her on the briefs), Honolulu, for defendant-appellee.

Richard M. Rand, Honolulu, for amicus curiae Hawai'i Chamber of Commerce.

John Ishihara, Honolulu, for amicus curiae Hawai'i Civil Rights Commission.

Elizabeth Jubin Fujiwara, Honolulu, for amicus curiae National Employment Lawyers Association.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

In this employment discrimination lawsuit alleging violation of Hawai'i Revised Statutes (HRS) § 378–2(1) (Supp.1996)[1] and HRS Chapter 368, Plaintiff–Appellant George Furukawa appeals the granting of Defendant–Appellant Honolulu Zoological Society's (Society) motion for a directed verdict. The Society cross-appeals the trial court's denial of its motion for attorneys' fees. Because we hold that the trial court erred in directing a verdict against Furukawa, we vacate the grant of the Society's motion for directed verdict and remand for proceedings consistent with this opinion.[2]

1. **§ 378–2. Discriminatory practices made unlawful; offenses defined.**

 It shall be an unlawful discriminatory practice:
 (1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:
 (A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment;
 (B) For any employment agency to fail or refuse to refer for employment, or to classify or otherwise to discriminate against, any individual;
 (C) For any employer or employment agency to print, circulate, or cause to be printed or circulated any statement, advertisement, or publication or to use any form of application for employment or to make any inquiry in

## I. BACKGROUND

The Society is a private, non-profit corporation which supports the Honolulu Zoo by raising funds and providing volunteer services. In November 1990, Furukawa submitted his resume to the Society for the position of administrative assistant to the executive director, then Dan Durbec. After first being told that another candidate had been selected, Furukawa took a job with a local law firm. But shortly thereafter the position was offered to Furukawa because the other candidate had not reported to work; Furukawa resigned from the firm and accepted the higher-paying position at the Society.

The Society is governed by a Board of Directors consisting of two dozen volunteers. The board is headed by a president. At the time Furukawa was hired by the Society, the president was Eric Ako, a male veterinary doctor of Asian descent. In July 1991, the presidency was assumed by Sue Pruett, a female Caucasian; after Pruett's premature resignation in December, the position of president of the board was filled by Linda Ross, also a female Caucasian.

Furukawa was employed as administrative assistant from December 1990 until January 1992. His responsibilities included maintaining the Society's membership files, handling membership donations, increasing membership, producing the Society newsletter, and assisting with fund raising and public relations. At the time of Furukawa's employ-

connection with prospective employment, which expresses, directly or indirectly, any limitation, specification, or discrimination;
(D) For any labor organization to exclude or expel from its membership any individual or to discriminate in any way against any of its members, employer, or employees; or
(E) For any employer or labor organization to refuse to enter into an apprenticeship agreement as defined in section 372–2; provided that no apprentice shall be less than sixteen years of age[.]

2. Because of our disposition of this appeal, we need not reach the grant of a directed verdict as to Furukawa's punitive damages claim, or the denial of the Society's claim for attorneys' fees. Because Furukawa's brief did not dispute the trial court's granting of a directed verdict as to his claims for implied breach of employment contract and for constructive discharge, the dismissal of those claims is affirmed.

ment, the Society had five regular employees: Executive Director Dan Durbec, a male Caucasian; "Zootique" Manager Jenny Kaulupali, a female Caucasian; Betsy Robertson, assistant manager of the Zootique, a female Caucasian; Furukawa, an Asian male; and Adoption Coordinator Susan Kroe, a female Caucasian. Durbec joined the Society in August 1990; Kroe had been hired in July 1990. Kaulupali had worked at the Society for a number of years. Durbec, Furukawa and Kroe shared the Society's offices; Kaulupali and Robertson worked in the Zootique. All of these employees were full-time, with the exception of Kroe, who worked twenty hours weekly on a flexible schedule—to accommodate both her physical rehabilitation following an accident (which preceded her employment at the Society), as well as her other work as a sign language interpreter.

Upon being hired, Furukawa received a copy of the Society's personnel policy manual. At the end of his three-month probationary "orientation" period, in March 1991, Furukawa was evaluated, pursuant to the manual's "Employee Evaluations, Goals and Salary Review" section. His supervisor, Executive Director Durbec, gave him a positive evaluation, rating Furukawa as "Very Good" overall. Furukawa testified that during this period he was not informed of any dissatisfaction with his job performance. On the contrary, in April 1991, the Society's board voted Furukawa a raise, from $18,000 to $21,500 annually. Furukawa also received a "Very Good" rating at his six-month performance review, in June.

In support of his claim of discrimination, Furukawa attempted to show that, although the policy manual provided for regular evaluation of employees by their immediate supervisor, the executive director was not allowed to perform such reviews of any Society employees except Furukawa. The Society in its brief admits that "Durbec inquired about evaluating the manager of the Zootique and was told by Dr. Ako, the President of the Society, that he would be permitted to evaluate her later." Evaluation of the two Zootique employees was performed by the personnel committee, without Durbec in attendance. Further-

more, after Durbec expressed concern regarding Kroe's hours to then-Board President Ako, Dr. Ako told him to treat Kroe with "kid gloves." Furukawa claims that this "disparate application of the Policy Manual's performance evaluation procedures resulted in the female/Caucasian employees of the Society not being subjected to the risk of a negative performance evaluation while Mr. Furukawa was regularly subjected to that risk."

Additionally, there was testimony to the effect that relationships among Pruett, Irvine, Kroe and Kaulupali, on the one hand, and Durbec and Furukawa, on the other were strained. Durbec and Furukawa each testified that Kroe was hostile towards them. During his first week of employment, Furukawa was told by one board member, Victoria Calvert, that "you're a brave man, George, I admire you for accepting this position, those women on the board are hard to please." Furukawa testified that board member Candy Irvine, another female Caucasian, who assisted with the production of the newsletter, once told him—"not verbatim"—that "I realize that because of your ethnic background and your culture and where you were raised you are taught to be polite and agreeable and that's inherent to the local Japanese culture, but I really think you should be more forceful in your deadlines." Furukawa testified that Pruett told him, on one occasion, that "I hope you are not intimidated by me, but ... I am the Society, therefore, you take directions from only me and not Mr. Durbec," a statement Pruett admitted to making.

As relationships deteriorated, at some point Kroe and Kaulupali began reporting on the two men's activities to Pruett—first verbally and then in writing. Pruett then communicated this information—including detailed factual accusations—along with her concerns and those of board member Irvine, to the personnel committee in preparation for Durbec's annual performance review. This documentation was unknown to Durbec or Furukawa until discovered amongst papers left by Pruett subsequent to her resignation as president.

In preparation for Durbec's review, the chair of the personnel committee requested that Durbec turn over his and Furukawa's personnel files. When Durbec asked if he should include the files of Kaulupali and Robertson, who were also due for a review, he was told that "the committee was looking at George [Furukawa] and me." Durbec's review took place over two days in late November 1991. Although Furukawa was himself due for an annual performance review in December 1991, the personnel committee's review of Durbec in fact focused largely on the absent Furukawa rather than on Durbec, resulting in Durbec's being instructed to "find a more competent, efficient assistant." This recommendation was based not on the formal performance reviews of Furukawa by Durbec, but on the comments on Furukawa's performance made by Pruett, Irvine, Kaulupali and Kroe. Durbec testified that, although he understood at the time that the board wanted him to begin termination proceedings against Furukawa, he declined to do so because he felt such action was not justified.

Cross-examining Furukawa's witnesses, the Society sought to show that concerns about Furukawa's job performance began to be expressed soon after he was hired; that he was uncommunicative, passive, and lacked initiative; that his April 1991 raise was meant as an "incentive" and was not based on merit; that he was slow in learning the office's computer software and accidentally deleted a number of files from the database; and that his work on the newsletter was deficient and "an embarrassment to the Society." In support of this allegation, there was testimony that Furukawa had misspelt a reference to "ruffed lemurs" in the newsletter, calling them "ruffled lemurs."

On learning of the personnel committee's action from Durbec, Furukawa filed a grievance with the Society. By letter of December 1, 1991, Board President Pruett scheduled a December 5 meeting to discuss the grievance; she later canceled the meeting on the advice of an attorney. Pruett resigned from the board on December 7, 1991. The Board's executive committee met without Furukawa to discuss the grievance on December 18. Furukawa was then informed that the Board wanted to meet with him and "to establish new performance goals." However, no such meeting took place. Feeling that the conditions of his employment had become "intolerable," Furukawa resigned from the Society on January 15, 1992.

On February 7, 1992, Furukawa filed a discrimination charge against the Society with the Hawai'i Civil Rights Commission (Commission), alleging that he had been discriminated against on the basis of his race and gender in that similarly-situated female Caucasian co-workers were not subjected to the same work standards as he was. On May 27, Furukawa requested and received a Notice of Dismissal and Right to Sue from the commission. On June 9, 1992, Furukawa filed this complaint in the First Circuit Court alleging discrimination on the basis of race and gender.

At trial, Furukawa sought to introduce the testimony of Ronald P.C. Chang, a former executive director of the Society. In mid-1990, Sue Pruett accused Chang of embarrassing the Society at a City Council hearing and ordered the executive director not to attend any meetings in the future without her express approval. After he was unable to get this directive overturned by the Society's then-president, Dr. Ako, Chang resigned.

The trial court repeatedly declined to permit Chang to testify. In addition, the trial court ruled that it would not allow evidence relating to emotional distress claimed by Furukawa to have resulted from the actions taken by the Society. After Furukawa rested, the trial court granted the Society's motion for a directed verdict. Furukawa brings this timely appeal.

## II. *DISCUSSION*

### A. *Standards of Review*

■ Reviewing the grant of a directed verdict, we apply the same standard as the trial court. *Weinberg v. Mauch,* 78 Hawai'i 40, 50, 890 P.2d 277, 287, *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995).

[A] directed verdict may be granted only when after disregarding conflicting evidence, giving to the [non-moving party's]

evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in [the non-moving party's] favor, it can be said that there is no evidence to support a jury verdict in his [or her] favor. *Id.* at 50, 890 P.2d at 287 (quoting *Wakabayashi v. Hertz Corp.*, 66 Haw. 265, 271, 660 P.2d 1309, 1313 (1983)) (alterations in original).

■ While a trial court's exclusion of relevant evidence is reviewed for abuse of discretion, *see, e.g., State v. Robinson*, 79 Hawai'i 468, 471, 903 P.2d 1289, 1292 (1995), "[t]his court reviews questions of relevancy ... under the 'right/wrong' standard[.]" *State v. Wallace*, 80 Hawai'i 382, 409, 910 P.2d 695, 722 (1996) (footnotes omitted).

■ A trial court's findings of facts are reviewed to see if they are clearly erroneous; conclusions of law are reviewed under the right/wrong standard. *Hirono v. Peabody*, 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996).

■ Finally, the meaning of a statute is a question of law that this court reviews *de novo. Ross v. Stouffer Hotel Co. (Hawai'i), Ltd.*, 76 Hawai'i 454, 460, 879 P.2d 1037, 1043 (1994).

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. Where the language of a statute is plain and unambiguous, our only duty is to give effect to the statute's plain and obvious meaning. Further, in interpreting a statute, we give the words their common meaning, unless there is something in the statute requiring a different interpretation.

*Iddings v. Mee–Lee*, 82 Hawai'i 1, 6–7, 919 P.2d 263, 268–69 (1996) (citations and footnote omitted).

### B. *The Trial Court Erred in Excluding Chang's Testimony.*

### 1. "Similarly Situated" Means Similar in All Relevant Respects

In directing a verdict against Furukawa, the trial court ruled as follows:

[I]t is apparent to the Court that Plaintiff has not sustained his burden with respect to make [sic] a prima facie case of this matter.

There is no direct evidence of discrimination, so the Court needs to look at areas that are through the Mcdonald [sic] Douglas type test circumstantial evidence showing disparate treatment, but as has been noticed, it would appear to the Court that *... there are no similar type comparisons to others that the Plaintiff seeks to say that they were given preferential treatment.*

Miss Kroe was a part-time worker, Miss Kaulupali is a manager of the Zootique. It would appear to the Court that with respect to this area about the comparison with respect to similar situated employees, the Plaintiff does not measure up.

(Emphasis added.) In other words, the trial court ruled that because Kroe worked part-time and Furukawa worked full-time, the two employees were not comparable; because Kaulupali and Robertson worked in the Zootique and Furukawa assisted Durbec in the administrative office, any comparison with them was also irrelevant. We disagree.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court developed the following three-part framework for analyzing the development of proof in an employment discrimination case. First, the plaintiff must demonstrate by a preponderance of the evidence that there was discrimination on the basis of a protected characteristic. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory explanation of the adverse employment action. *Id.* at 253, 101 S.Ct. at 1093–94. Finally, if a defendant successfully rebuts the presumption, the burden returns to the plaintiff, to show that the defendant's explanation was pretextual. The burden of persuasion of

course remains at all times on the plaintiff. *Id.*[3]

Of course, a federal court's interpretation of Title VII is not binding on this court's interpretation of civil rights laws adopted by the Hawaiʻi legislature. However, the *McDonnell Douglas* framework can be a useful analytical tool in resolving "the elusive factual question of intentional discrimination." *Id.* at 256 n. 8, 101 S.Ct. at 1095 n. 8.

> The central focus of the inquiry in a case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' The method suggested in *McDonnell Douglas* for pursuing this inquiry was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.

*Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). And "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094; *see also Sischo–Nownejad v. Merced Community College District,* 934 F.2d 1104, 1108 (9th Cir.1991) ("the amount [of evidence] that must be produced is very little.") (internal quotation marks omitted).

In the absence of relevant Hawaiʻi case law, both parties rely on federal judicial decisions. Unlike federal law, however, the State of Hawaiʻi extends its employment discrimination protection to all employers, not just employers with fifteen or more employees. HRS § 378–1 (1993) defines "employer" to mean "any person ... having one or more employees[;]" *cf.* 42 U.S.C.A § 2000e(b) (West 1994). The federal courts have considerable experience in analyzing these cases, and we look to their decisions for guidance.

But, as the California Supreme Court recently observed, federal employment discrimination authority is not necessarily persuasive, particularly where a state's statutory provision differs in relevant detail. *Romano v. Rockwell Int'l, Inc.,* 14 Cal.4th 479, 59 Cal. Rptr.2d 20, 30–31, 926 P.2d 1114, 1125 (1996); *see also Schweigert v. Provident Life Ins. Co.,* 503 N.W.2d 225 (N.D.1993) (modifying *McDonnell Douglas* test).

Relying on decisions which have held that comparable employees must be "similarly situated *in all respects* [,]" *Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir.1992) (original emphasis), the Society insists that Furukawa be required to show, as part of his *prima facie* case, that any individual he seeks to compare his treatment with must have (1) dealt with the same supervisor, (2) been subject to the same standards, and (3) engaged in the same conduct, without differentiating or mitigating circumstances that would distinguish the conduct or the employer's treatment. The Society urges that discrimination plaintiffs be required to compare their treatment to others only if the comparison involves "the same offense" or "the same performance problems." In light of the applicability of employment discrimination law in Hawaiʻi to all employers, no matter how small, we find the Society's proposed test excessively narrow.

In *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir.1994), the Sixth Circuit faced a claim brought against an employer by a male supervisor who was disciplined for sexually inappropriate behavior with a female subordinate employee. Pierce claimed discrimination in that the subordinate had engaged in similarly egregious behavior, but had not been disciplined. The court held that the comparison was invalid because the two employees were not similarly situated:

---

**3.** The federal circuits generally agree on the following three-part test for a prima facie case involving discharge: (1) The plaintiff must be a member of a protected class; (2) the plaintiff must be demonstrably capable of performing his employment duties; and (3) the employer, after discharge, sought people with the same qualifications to fill the position. *See, e.g., Osborne v. Cleland,* 620 F.2d 195, 198 (8th Cir.1980); *Cum-*

*piano v. Banco Santander Puerto Rico,* 902 F.2d 148 (1st Cir.1990); *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985); *Walker v. St. Anthony's Medical Center,* 881 F.2d 554 (8th Cir.1989); *see also E.E.O.C. v. Brown & Root, Inc.,* 688 F.2d 338, 340–41, *reh'g denied,* 692 F.2d 757 (5th Cir.1982) (four-prong test for demonstrating discrimination via disparate application of company policies or practices).

The following distinctions between Pierce and Kennedy are undisputed: Pierce was a supervisor and Kennedy was not; Pierce had responsibility over three offices, whereas Kennedy was an "office administrator" with no supervisory control over any other employees; Pierce evaluated employees, including Kennedy, while Kennedy evaluated no one; and, unlike Kennedy, Pierce attended agency group meetings and was responsible for enforcement of the company's sexual harassment policy. *Id.* at 802. However, the Sixth Circuit's holding does not rest on the simple fact that the two employees held different positions in the workplace hierarchy. Instead, the court focused on a particularly relevant detail that distinguished them: unlike Kennedy, Pierce—as a supervisor—could be considered the employer's agent, and because following this incident the employer was on notice of his behavior, the employer could itself be held liable under Title VII for sexual harassment for any such behavior in the future. This was not true of Kennedy. *Id.* at 803–04. "Under these circumstances, the relevant aspects of his employment are not, as Pierce claims, 'nearly identical' to Kennedy's employment." *Id.* at 804.

▇ Generally, similarly situated employees are those who are subject to the same policies and subordinate to the same decision-maker as the plaintiff. In considering whether a fellow employee can be considered similarly situated, we agree with the *Pierce* court's focus on those distinguishing aspects relevant to the claimed discrimination. We hold that Furukawa must prove that all of the *relevant aspects* of his employment situation were similar to those employees with whom he seeks to compare his treatment. *See, e.g., Pierce,* 40 F.3d at 802; *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995); *Pearson v. Macon–Bibb County Hosp. Auth.,* 952 F.2d 1274, 1280 (11th Cir.1992); *Rohde v. K.O. Steel Castings, Inc.,* 649 F.2d 317, 322 (5th Cir.1981) ("Differences in job status and skill may well have an impact on the second phase of proof under *McDonnell Douglas,* ... but they should not defeat a prima facie case[.]"); *Hager v. Western Sizzlin Steak*

*House, Inc. (Augusta),* 537 F.Supp. 1016, 1017 (S.D.Ga.1982) ("The fact that the plaintiff and Bass held dissimilar positions is irrelevant to a determination of what constitutes 'similar circumstances' in this case.").

▇ Applying this test, we do not agree that Furukawa, Kroe, Kaulupali and Robertson were not "similarly situated" employees and thus irrelevant to Furukawa's *prima facie* case of discrimination. All four employees were subject to the same decision-makers—Durbec as executive director, Pruett as president of the board, and the other members of the board. While Kroe and Furukawa kept different hours and had differing titles, the two worked in close proximity in the same office under the same supervisor, were subject to the same personnel manual, and interacted with the same individuals whose conduct is at issue in this case. Similar reasoning favors allowing Furukawa to compare his treatment with that of Kaulupali and Robertson.

The Society raises the specter of a flood of discrimination suits brought "simply because one employee may have committed an offense which no other employee has committed, even though there is no evidence of disparate treatment sufficient to establish a *prima facie* case." But any lawsuit brought without evidentiary support should be easily dismissed. Amicus curiae Hawai'i Chamber of Commerce protests that "[n]o legitimate discriminatory inference can be drawn from pointing to others of the same sex or race who also suffered adverse employment actions without comparing how others not of the same race or sex were treated in similar situations...." Yet under the trial court's ruling, as urged by the Society, Furukawa's entire effort to do exactly this—by demonstrating preferential treatment afforded Kroe, Kaulupali, and Robertson, and the allegedly similar discrimination suffered by Chang—was deemed legally irrelevant. Pursuant to the Society's view, Furukawa would be barred from bringing a discrimination claim, in effect, because the Society had only five employees, none of whom were similar to him "in all respects." Insistence on the strict "similarly situated" requirement urged

on us here would—in the absence of outrageous conduct giving rise to direct evidence of discrimination—be equivalent to re-writing this state's employment discrimination law to apply only to those employers with a sufficient number of employees to provide a basis for similarly situated comparisons. This clearly was not the intent of the legislature when it made Chapter 378 apply to *all* employers.

Additionally, the Society argues that Furukawa's claim must fail unless he proffers evidence of similarly situated employees outside the protected class who received *better* treatment. We disagree. "Although proof regarding similarly situated employees outside the protected class may be one way of raising an inference of intentional discrimination, *it is not the only way.*" *Heard v. Lockheed Missiles & Space Co., Inc.,* 44 Cal.App.4th 1735, 52 Cal.Rptr.2d 620, 632 (1996) (original emphasis).

> To state that a plaintiff may never establish a prima facie case if the plaintiff fails to produce evidence that similarly-situated employees outside the protected class were promoted [or received other favorable treatment], restricts unfairly the circumstances from which discrimination may be inferred. Such a requirement ... emphasizes one way of proving intentional discrimination instead of properly focussing on the pivotal issue in disparate treatment cases—whether a *particular individual* was discriminated against and why.

*Id.* 52 Cal.Rptr.2d at 632 (citation omitted) (original emphasis).

As this case demonstrates, proof of discriminatory intent will often present a difficult burden for plaintiffs in these cases. The absence of the kind of evidence discussed by the Society will likely bear heavily on Furukawa's—or any plaintiff's—ability to prove that he or she was the victim of illegal discrimination. But circumstantial evidence bearing on the ultimate issue should not be automatically excluded by the application of arbitrary rules. *Cf. Riordan v. Kempiners,* 831 F.2d 690, 698 (7th Cir.1987) ("A plaintiff's ability to prove discrimination ... circumstantially, must not be crippled by evidentiary rulings that keep out proba-

tive evidence because of crabbed notions of relevance or excessive distrust of juries.").

### 2. The Trial Court Erred in Excluding Chang's Testimony.

Furukawa claims that the trial court committed prejudicial error when it excluded the testimony of Ronald Chang. The Society argues that Chang's testimony was not relevant because he was not a similarly situated employee to Furukawa. In finding Chang's testimony irrelevant, the trial court agreed:

> I think the comparison to others similarly situated is a very important criteria in disparate treatment in discriminatory type cases. Otherwise, you really cannot have a comparison to show, and I understand that most of the cases deal with large firms, and therefore you can show by statistics in other matters as to what has happened to show disparate treatment.
>
> This is a smaller group, and that's why I've really kind of kept it open ... but in the Court's mind I do not think you can change the standard that there must be a comparison to others similarly situated, and you cannot compare the plaintiff's actions or the claims for discrimination to others not similarly situated[.]
>
> ...
>
> I do have some problems with permitting Mr. Chang to testify at this time.

Chang would have testified that he is a male of Asian descent who has over twenty years experience in administrative and public relations for non-profit corporations. He became executive director of the Society in August 1989; at that time, Ako was the president of the Society and Pruett served as vice president. While attending a city council hearing relating to zoo funding in April 1990, Chang's statement of the Society's position on an issue apparently did not comport with Pruett's view; the next day, Pruett accused Chang of "making a fool" of himself before the council. She ordered the executive director not to attend any further meetings without her prior approval. Chang was unable to convince Pruett and board President Ako that such a directive impaired his ability to carry out his duties; as a result,

Chang felt compelled to resign from the Society.[4]

As we have already held above, the fact that Chang served the Society in the capacity of executive director, whereas Furukawa was an administrative assistant, does not alone render any comparison between the two employees irrelevant as a matter of law. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Hawai'i Rules of Evidence (HRE) Rule 401. All relevant evidence is admissible. HRE Rule 402. Because a plaintiff in an employment discrimination case must ultimately prove intent to discriminate, evidence of an employer's prior acts toward co-employees is probative of intent. "[T]he mind of an alleged offender may be read from his [or her] acts, conduct and inferences fairly drawn from the circumstances." State v. Batson, 73 Haw. 236, 254, 831 P.2d 924, 933, reconsideration denied, 73 Haw. 625, 834 P.2d 1315 (1992) (quoting State v. Sadino, 64 Haw. 427, 430, 642 P.2d 534, 536–37 (1982)).[5] Furukawa and Chang are both Asian and male; they were each subject to Pruett's supervision; both had significant problems with that supervision, including being told that their work was an embarrassment to the Society; each resigned on the grounds that they felt that their work environment was made intolerable by Pruett's actions.

Of course, Chang's testimony does not conclusively prove that the Society discriminated against Furukawa. But

[t]he concept of relevance ... does not encompass standards of sufficiency. [The] contention that evidence which, standing alone, is insufficient to establish a controverted fact, should be inadmissible is totally without basis in the law. It is often said that a brick is not a wall. [The foregoing contention] through a "sufficiency" standard would take away the building blocks of a prima facie case. The sufficiency standard should apply only when all the bricks of individually insufficient evidence are in place and the wall is itself tested.

Wallace, 80 Hawai'i at 409, 910 P.2d at 722 (quoting State v. Irebaria, 55 Haw. 353, 356, 519 P.2d 1246, 1248–49 (1974). We cannot say that the proffered testimony was of no probative value on the central issue of the alleged gender and/or racial animus of Pruett towards men or towards those of Asian ancestry.

Amicus curiae Chamber of Commerce of Hawai'i argues that "[a]n interpretation of the law that permits plaintiffs to make a prima facie case merely by pointing to one other person of the same race or sex who suffered an adverse employment action, would result in serious prejudice to employers." But Furukawa did not seek to rest his case on Chang's testimony alone. He was allowed to attempt to show that fellow female Caucasian employees were treated in a more favorable manner, but was prevented from attempting to illustrate the opposite inference by introducing Chang's testimony. We hold that the exclusion of Chang's testimony was in error.

### C. The Trial Court Erred in Excluding Evidence of Furukawa's Emotional Distress.

Furukawa further claims that the trial court erred in excluding evidence of his emotional distress. The trial court held that the exclusivity provision of the workers' compensation statute, HRS § 386–5 (1993),[6] barred

---

4. We agree with amicus curiae Hawai'i Civil Rights Commission that the fact that Chang did not himself feel that he was discriminated against does not make his testimony irrelevant, but rather goes to its weight.

5. HRE Rule 404(b) (Supp.1996) reads in relevant part:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts ... may ... be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of

motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident....

6. **§ 386–5. Exclusiveness of right to compensation; exception.**

The rights and remedies herein granted to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee, the employee's legal representative, spouse, dependents, next of kin, or anyone else entitled to recover damages

Furukawa from making a claim for emotional distress under either HRS § 368–17 (1993) [7] or HRS § 378–5 (1993).[8] In *Ross*, this court assumed, for the sake of argument, "that HRS § 368–17(a) permits a court to award compensatory and punitive damages in civil actions brought under Part I of HRS Chapter 378." 76 Hawai'i at 463, 879 P.2d at 1046. That question is now squarely presented.

The Commission provides the mechanism for enforcement of discrimination law in Hawai'i. *See* HRS Chapter 368; HRS § 378–4 (Supp.1996). As a remedial statute designed to enforce civil rights protections and remedy the effects of discrimination, Chapter 368 should be liberally construed in order to accomplish that purpose. *See, e.g., Flores v. United Air Lines,* 70 Haw. 1, 757 P.2d 641 (1988).

Section 368–17 provides in part:

(a) The remedies ordered by the commission or the court under this chapter *may include compensatory and punitive damages* and legal and equitable relief, including, but not limited to:

. . .

(8) Payment to the complainant of damages for an injury or loss caused by a violation of . . . part I of chapter 378[.]

(b) *Section 386–5 notwithstanding, a workers' compensation claim or remedy*

---

from the employer, at common law or otherwise, on account of the injury, except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.

**7. § 368–17. Remedies.**

(a) The remedies ordered by the commission or the court under this chapter may include compensatory and punitive damages and legal and equitable relief, including, but not limited to:

(1) Hiring, reinstatement, or upgrading of employees with or without back pay;

(2) Admission or restoration of individuals to labor organization membership, admission to or participation in a guidance program, apprenticeship training program, on-the-job training program, or other occupational training or retraining program, with the utilization of objective criteria in the admission of persons to those programs;

(3) Admission of persons to a public accommodation or an educational institution;

(4) Sale, exchange, lease, rental, assignment, or sublease of real property to a person;

(5) Extension to all persons of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the respondent;

(6) Reporting as to the manner of compliance;

(7) Requiring the posting of notices in a conspicuous place that the commission may publish or cause to be published setting forth requirements for compliance with civil rights law or other relevant information that the commission determines necessary to explain those laws;

(8) Payment to the complainant of damages for an injury or loss caused by a violation of chapters 489, 515, part I of chapter 378, or this chapter, including a reasonable attorney's fee;

(9) Payment to the complainant of all or a portion of the costs of maintaining the action before the commission, including reasonable attorney's fees and expert witness fees, when the commission determines that award to be appropriate; and

(10) Other relief the commission or the court deems appropriate.

(b) Section 386–5 notwithstanding, a workers' compensation claim or remedy does not bar relief on complaints filed with the commission.

**8. § 378–5. Remedies.**

(a) The commission may order appropriate affirmative action, including, but not limited to, hiring, reinstatement, or upgrading of employees, with or without backpay, restoration to membership in any respondent labor organization, or other remedies as provided under chapter 368, which in the judgment of the commission, will effectuate the purpose of this part, including a requirement for reporting on the manner of compliance.

(b) In any civil action brought under this part, if the court finds that a respondent has engaged in or is engaging in any unlawful discriminatory practice as defined in this part, the court may enjoin the respondent from engaging in such unlawful discriminatory practice and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement, hiring, or upgrading of employees, with or without backpay, or restoration of membership in any respondent labor organization, or any other equitable relief the court deems appropriate. Backpay liability shall not accrue from a date more than two years prior to the filing of the complaint with the commission.

(c) In any action brought under this part, the court, in addition to any judgment awarded to the plaintiff or plaintiffs, shall allow costs of action, including costs of fees of any nature and reasonable attorney's fees, to be paid by the defendant.

*does not bar relief on claims filed with the commission.*

(Emphases added.) *See also* HRS § 368–3(5) (1993) ("The Commission shall have the following powers and functions: ... (5) To order appropriate legal and equitable relief[.]"). The Commission and the courts clearly have the power to award compensatory damages, including damages for emotional distress, pursuant to these statutes.

The workers' compensation law covers employees who suffer "personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment[.]" HRS § 386–3 (Supp.1996).[9] Section 386–5 provides that the rights and remedies made available under the workers' compensation statute "shall exclude all other liability of the employer to the employee ... on account of the injury[.]" *See supra* note 6. Faced with the interpretation of this provision to bar civil actions premised on sexual harassment or sexual assault in the employment context, *see, e.g., Lui v. Intercontinental Hotels Corp. (Hawai'i),* 634 F.Supp. 684 (D.Haw.1986), the legislature amended the exclusivity provision in 1992 to exclude such actions from its coverage, adding the following language to HRS § 386–5: "except for sexual harassment or sexual assault ... in which case a civil action may also be brought." The legislative history provides no support for the argument that this change was intended to affect the scope of remedies under Chapter 378. *See* Conf. Comm. Rep. No. 21, in 1992 House Journal, at 678–80, 799 ("The purpose of this bill is to amend Chapters 378 and 386 ... to enable employees to file civil actions premised on sexual harassment or sexual assault arising out of and in the course of employment.").

The Society and amicus curiae Chamber of Commerce assert that this specific exclusion mandates that all other physical and emotional damages resulting from work-related injuries and accidents are barred by the workers' compensation scheme. Furukawa and his amici, the Commission and the National Employment Lawyers Association, counter that such a reading would render HRS § 368–17 meaningless.

 We agree with the Society that the workers' compensation scheme serves to bar a civil action for physical and emotional damages resulting from work-related injuries and accidents. However, Furukawa's claims are not based on any such "accident," but rather on the alleged intentional conduct of members of the Society. *Cf. Wharton v. Hawaiian Elec. Co., Inc.,* 80 Hawai'i 120, 123 n. 2, 906 P.2d 127, 130 n. 2 (1995) (affirming denial of workers compensation stress claim because injury arose out of worker's suspension for misconduct, but noting that "[i]f an employer's actions constitute unlawful discrimination ..., an injured employee may invoke rights in other forums. *See, e.g.,* HRS §§ 378–2 and 378–32."). Most states recognize that "all or virtually all intentionally tortious acts committed by an employer against an employee in the course of employment are excluded from the workers' compensation system." *Fermino v. Fedco, Inc.,* 7 Cal.4th 701, 30 Cal.Rptr.2d 18, 21, 872 P.2d 559, 562 (1994); *see also Van Biene v. ERA Helicopters, Inc.,* 779 P.2d 315, 318 (Alaska 1989); *Medina v. Herrera,* 927 S.W.2d 597, 600 (Tex.1996).

 Compensatory and punitive damages are generally available in employment discrimination cases, as remedies from a court or an agency, or both. Larson, 6 *Employment Discrimination* § 114.08 (1996). Furukawa properly filed his discrimination complaint with the commission within 180 days, pursuant to HRS § 368–11(c). As provided for under HRS § 368–12 (1993),[10] Furukawa requested and received a Notice of Dismissal

---

9. "Accident" is defined in § 386–3 to include "the wilful act *of a third person* directed against an employee because of the employee's employment." (Emphasis added.)

10. **§ 368–12 Notice of right to sue.**
 The commission may issue a notice of right to sue upon written request of the complainant. Within ninety days after receipt of a notice of right to sue, the complainant may bring a civil action under this chapter. The commission may intervene in a civil action brought pursuant to this chapter if the case is of general importance.
 While the HCRC has not formally intervened in this action, it has filed an amicus brief.

and Right to Sue from the commission. Furukawa then brought his complaint in circuit court. The law is explicit that "a workers' compensation claim or remedy does not bar relief on claims filed with the commission." HRS § 368–17(b).

The Commission points out that the 1992 amendment was responding to concerns "that victims of sexual harassment were often so traumatized by the occurrence" that they might fail to file with the commission within 180 days. The legislature at the same time added HRS § 378–3(10), which excepts victims of sexual harassment and sexual assault from having to file discrimination complaints with the commission under HRS § 378–4. Because the exemption in HRS § 368–17(b) would no longer apply to these cases, as no complaint would have been filed with the commission, the legislature amended HRS § 386–5 to make clear that such claims were not barred by the workers' compensation law. It would indeed be an awkward result to interpret the amendment to HRS § 386–5 to have effected a repeal of the provision it sought to implement.

■ Furthermore, when the legislature passed the 1992 amendment to the workers' compensation exclusivity exemption, it did not repeal HRS § 368–17(b). To rule that the 1992 amendment effectively bars compensatory and punitive damages for all discrimination complaints filed with the commission would serve implicitly to repeal that section. Repeals by implication are disfavored. *International Savings & Loan, Ltd. v. Wiig*, 82 Hawai'i 197, 200, 921 P.2d 117, 120 (1996).

### III. *CONCLUSION*

Because the trial court erroneously ruled that Furukawa failed to compare his treatment to that of similarly situated employees, we vacate the grant of the Society's motion for directed verdict and remand for proceedings consistent with this opinion.