**Sharon BLACK, Plaintiff,**

v.

**CITY & COUNTY OF HONOLULU; Michael Nakamura; Joseph B. Aveiro, Jr.; Rafael Fajardo; and Doe Defendants 1–20, Defendants.**

**Nos. CIV. 97–01086SPK, 98–00259DAE.**

United States District Court,
D. Hawai'i.

Sept. 1, 2000.

---

Emlyn Higa, Honolulu, HI, Patricia A. Shiu, San Francisco, CA, for Plaintiff Sharon Black.

Caron M. Inagaki, Office of Corporation Counsel, Honolulu, HI, for Defendant City & County of Honolulu.

Patsy H. Kirio, R. Scott Simon, John T. Komeiji, Watanabe Ing & Kawashima, Honolulu, HI, for Defendant Michael Nakamura.

Joseph A. Wolsztyniak, Jr., Honolulu, HI, for Defendant Joseph B. Aveiro, Jr.

Richard F. Nakamura, Ayabe Chong Nishimoto Sia & Nakamura, Honolulu, HI, for Defendant Rafael Fajardo.

### MEMORANDUM IN SUPPORT OF ORDER OF AUGUST 8, 2000

KING, District Judge.

### INTRODUCTION

On August 4, 2000, the following motions came on for hearing: (1) Defendant City & County of Honolulu's motion for partial dismissal; (2) Plaintiff's motion for partial summary judgment; (3) Defendant Michael Nakamura's countermotion for partial summary judgment; (4) Defendant Rafael Fajardo's motion for partial sum-

mary judgment. On August 8, 2000, this Court issued an order denying Defendant City & County of Honolulu's motion; denying Plaintiff's motion; granting in part and denying in part Defendant Nakamura's motion; and denying Defendant Fajardo's motion. In this memorandum, the Court explains the reasoning for its Order.

## FACTUAL BACKGROUND

Plaintiff Sharon Black ("Black") is the coordinator of Project Outreach, a community-based program sponsored by the Honolulu Police Department ("HPD") that provides assistance for the homeless, families in crisis, disabled individuals, and victims of domestic violence. In 1992, then Police Chief Michael Nakamura ("Nakamura") assigned full responsibility for Project Outreach to then Assistant Chief Joseph Aveiro ("Aveiro"). Black reported directly to Aveiro. Also within Aveiro's chain of command was Major Rafael Fajardo ("Fajardo").

It is undisputed that Aveiro and Black engaged in sexual relations while she was under his supervision. Aveiro claims that their relationship was consensual. Black adamantly maintains that she involuntarily submitted to his sexual advances.

Her account of their first sexual experience hews close to the prototype of sexual harassment. In July 1992, Aveiro paid Black an unannounced visit to her apartment. Shocked that he had come, Black allowed him in and excused herself to the bathroom to decide how to handle the situation. When she came out, Aveiro was laying on her bed, stripped down to his underwear, and stroking his penis. He told her to come over to him and she complied. They then had sexual intercourse. From 1992 to 1996, they had sexual intercourse three more times. In addition, according to Black, Aveiro frequently made sexual advances toward her, referred to women in sexually derogatory terms, and described his anatomy and sexual exploits in graphic detail. In short, Black claims she was a victim of sexual harassment.[1]

Black alleges that she submitted to Aveiro's advances and initially kept quiet about his conduct because he led her to believe that he controlled the fate of Project Outreach. She thought her job was dependent on compliance with his demands and tolerance of his abusive behavior.

Between 1993 and 1996, Black formally requested to be transferred from Aveiro's chain of command. The HPD denied her requests. Three episodes of retaliation allegedly followed the transfer requests. First, Fajardo ordered an officer to issue to Black a counseling memo accusing her of grabbing Aveiro in a police station elevator. There turned out to be no incident of such kind. Second, Aveiro filed a complaint with the HPD's Internal Affairs department ("IA"), claiming that Black had solicited donations on the HPD's behalf without his permission. The complaint was based on an erroneous news story; in fact, the donations were for a volunteer project. The reporter of the story later informed the HPD of the error. Nevertheless, the complaint was investigated and presented to the Administrative Review Board ("ARB") for hearing and decision. Aveiro sat on the ARB and refused to recuse himself from ruling on the matter. The complaint was dismissed for lack of evidence. Third, Fajardo issued a counseling memo to Black for failure to maintain a clean office. Black claims the memo was undeserved.

In March 1996, Black told Captain Michael Nakagawa ("Nakagawa") about the July 1992 incident in which Aveiro visited her apartment. Nakagawa asked Black whether she wished to file a complaint. She declined, and Nakagawa took no further action.

---

1. Four acts of sexual intercourse over a period of four years can hardly be called a love affair.

On April 12, 1996, Johnny Papa ("Papa"), a friend and confidante of Black, sought assistance from Lieutenant Kathy Payne ("Payne") in ending a high ranking officer's harassment of an unnamed HPD employee. Payne in turn advised her supervisor, Captain Kenneth Tano ("Tano"), about her conversation with Papa. Black later contacted Payne and identified herself as the victim and Aveiro as the perpetrator. On April 23, 1996, Black filed a complaint of sexual harassment with the HPD. Black transferred to the command of Major Henry Lau ("Lau") that same day.

According to Black, numerous incidents of retaliation followed the filing of the complaint. She alleges that she received threatening notes and phone calls, including calls from Aveiro's sister; that she was the subject of "Operation Foxtrot," a twenty-four hour surveillance operation lasting approximately one week; that the HPD placed a wire trap on her pager; that false complaints from clients were filed against her; that her personnel file was tampered with; that she was isolated from male officers; that she was placed on administrative leave without pay for several weeks; that a police officer criticized her in front of a training academy class; and that the HPD released the confidential IA report on her complaint to the media.

Black also faults Nakamura with interfering with the investigation of her complaint. Procedural irregularities allegedly pervaded the investigation. However, the details of these allegations are not relevant to the disposition of the motions that were presently before the Court.

Aveiro received no discipline from the HPD. He retired in December 1996.

Black filed the instant lawsuit on August 20, 1997, and a First Amended Complaint on March 21, 2000. The complaint named Nakamura, Aveiro, Fajardo, and the City & County of Honolulu ("City"), among others, as defendants.[2] The first amended complaint asserts twenty-one counts: (1) battery; (2) assault; (3) sexual harassment: quid pro quo; (4) hostile work environment; (5) retaliation; (6) denial of employment opportunities; (7) civil rights violation (§ 1983); (8) conspiracy to interfere with civil rights (§ 1985(3)); (9) intentional infliction of emotional distress ("IIED"); (10) negligent infliction of emotional distress ("NIED"); (11) negligent retention; (12) negligent supervision; (13) negligent training; (14) invasion of privacy; (15) negligence to prevent discrimination (§ 1986); (16) aiding and abetting discriminatory practices; (17) failure to remedy sexual harassment; (18) special and general damages; (19) punitive damages; (20) declaratory relief; (21) injunctive relief.

Before the Court were four motions: (1) the City's motion for partial dismissal; (2) Black's motion for partial summary judgment; (3) Nakamura's countermotion for partial summary judgment; and (4) Fajardo's motion for partial summary judgment. On August 8, 2000, this Court entered an Order denying all motions except for Nakamura's motion, which was granted in part and denied in part.

## DISCUSSION

### I. THE CITY'S MOTION FOR PARTIAL DISMISSAL

#### A. Timeliness

Before proceeding to the merits of the City's motion for partial dismissal, the Court considered the threshold question of whether the motion was timely. A motion to dismiss made pursuant to Rule 12(b)(6) must be filed before the answer or other responsive pleading is filed. *See* Fed. R.Civ.P. 12(b); *see also Aetna Life Ins. Co. v. Alla Med. Servs., Inc.,* 855 F.2d 1470, 1474 (9th Cir.1988). The City filed the instant motion after it had already

---

**2.** The other defendants have settled out of the case.

filed its answer.[3] Cognizant of its mistake, the City requested that its motion be construed as one for judgment on the pleadings. Rule 12(c) provides that any party may move for judgment on the pleadings after the close of pleadings. *See* Fed. R.Civ.P. 12(c). The Court therefore construed the City's motion as a Rule 12(c) motion. The standard for deciding a Rule 12(b)(6) motion is identical to that applicable to a Rule 12(c) motion. *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir.1998); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

### B. *Merits*

The City sought dismissal of all negligence-based claims in this action, namely Count 10 (NIED), Count 11 (negligent retention), Count 12 (negligent supervision), Count 13 (negligent training), Count 15 (negligence to prevent discrimination), and Count 17 (failure to prevent sexual harassment). The gravamen of the City's motion was that the exclusivity provision of Hawaii's workers' compensation statute, Hawaii Revised Statutes ("HRS") § 386–5, bars all work-related actions that sound in negligence.[4]

HRS § 386–5 reads:

> The rights and remedies herein granted [in the workers' compensation statute] to an employee or the employee's dependents on account of a work injury suffered by the employee shall exclude all other liability of the employer to the employee ... on account of the injury, except for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto, in which case a civil action may also be brought.

Haw.Rev.Stat. § 386–5. The plain language of § 386–5 states an exception for sexual harassment and sexual assault, among other related causes of action. The exception is the product of a 1992 amendment to § 386–5. At issue is the scope of the exception.

■■■ The City argued that NIED is beyond the orbit of the exception. The statutory language admits to an exception for "infliction of emotional distress," but it does not disclose whether both the intentional and negligent varieties of the tort qualify for the exception. Faced with this ambiguity, the Court draws counsel from a well-settled principle of statutory construction: The legislature is presumed to know existing law when it enacts new legislation. *See United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir.1991). In Hawaii, as in every other jurisdiction, a plaintiff may recover for infliction of emotional distress caused by either negligent or intentional acts. Given the state of the law, the Hawaii legislature is presumed to refer to both NIED and IIED in amending HRS § 386–5 to include an exception for "infliction of emotional distress." There is no evidence that the legislature intended a contrary construction.

■■■ Whether the exception encompasses the remaining negligence claims is a murkier question. The exception pertains to "sexual harassment or sexual assault." The claims at issue do not seek relief for sexual harassment or sexual assault per se. Rather, they target the acts of negligence that led to sexual harassment or sexual assault, such as the negligent hiring and retention of Aveiro that put him in a position to sexually harass Black. The causes of action are not,

---

**3.** Additionally, Nakamura joined in the motion for partial dismissal after filing his answer.

**4.** The City cited *Kahale v. ADT Automotive Services, Inc.*, 2 F.Supp.2d 1295 (D.Haw. 1998), in support of its argument. *Kahale* held that Hawaii's workers' compensation

statute bars NIED claims. *See id.* at 1302. The NIED claim in that case was part of a suit seeking relief from discrimination based on race, ancestry, and age. As such, *Kahale* had no occasion to examine the exception for sexual harassment claims stated in § 386–5, which is discussed below.

strictly speaking, identical to those enumerated in the exclusivity exemption. It does not necessarily follow, however, that the exclusivity provision bars such negligence claims, for they are undeniably predicated on exempt acts of sexual harassment or assault. The significance of this is understood in light of the principle, recognized in Hawaii and elsewhere, that workers' compensation statutes do not bar actions based on intentional conduct. *See Furukawa v. Honolulu Zoological Soc'y,* 85 Hawai'i 7, 18, 936 P.2d 643, 654 (1997) (citing *Fermino v. Fedco, Inc.,* 7 Cal.4th 701, 30 Cal.Rptr.2d 18, 872 P.2d 559, 562 (1994); *Van Biene v. ERA Helicopters, Inc.,* 779 P.2d 315, 318 (Alaska 1989); *Medina v. Herrera,* 927 S.W.2d 597, 600 (Tex.1996)). Sexual harassment and sexual assault are intentional acts. *Cf. id.* (regarding race and gender discrimination as intentional conduct). Where the plaintiff asserts that her employer's negligence resulted in sexual harassment, the negligence is not actionable but for the intentional harassment. Such negligence claims are so intertwined with sexual harassment that they must be considered a species of the injury for which the legislature carved out an exception in the 1992 amendment. They are therefore exempt from the bar of the exclusivity provision.

The legislative history of the 1992 amendment reinforces this conclusion. The legislature amended § 386–5 in response to case law interpreting the provision as a bar to civil actions "premised on sexual harassment or sexual assault in an employment action." Conf. Comm. Rep. No. 21, 16th Leg., Reg. Sess. (Haw.1992), *reprinted in* 1992 Haw. House J. 799. One such case was *Lui v. Intercontinental Hotels Corp. (Hawaii),* 634 F.Supp. 684 (D.Haw.1986). *See Furukawa,* 85 Hawai'i at 18, 936 P.2d at 654. The plaintiff in *Lui* claimed, *inter alia,* that her employer negligently hired the employee who allegedly sexually assaulted and harassed her. The district court held that § 386–5 barred the claim. The 1992 amendment overruled *Lui,* thereby implying that the exclusivity provision excepts not only direct claims of sexual harassment or sexual assault, but also other related claims, such as negligent hiring.

Therefore, negligence claims "premised on sexual harassment or sexual assault in an employment context" are exempt from the bar of Hawaii's workers' compensation statute.

The City's motion for partial dismissal was therefore DENIED.

## II. *BLACK'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

Black moved for summary judgment on Count 5 (retaliation), Count 14 (invasion of privacy), and Count 17 (failure to prevent or remedy harassment) of her first amended complaint. Again, the Court addressed a question of threshold importance before analyzing the substantive merits of the motion: Can Nakamura be held liable in his individual capacity for the claims on which Black seeks summary judgment?

### A. *Nakamura's Individual Liability*

Title VII prohibits discriminatory practices by an "employer." *See* 42 U.S.C. § 2000e–2. Individual employees of employers, including supervisors and managers, are not personally liable as "employers" under Title VII. *See Pink v. Modoc Indian Health Project, Inc.,* 157 F.3d 1185, 1189 (9th Cir.1998); *Greenlaw v. Garrett,* 59 F.3d 994, 1001 (9th Cir.1995); *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 587 (9th Cir.1993). Here, Black sues Nakamura in his official and individual capacities. Nakamura is clearly not individually liable for the Title VII retaliation claim.

The remaining question is whether he enjoys immunity from the state law claims asserted against him. As a nonjudicial officer, he enjoys qualified immunity. That is, he is immune from liability unless Black provides "clear and convincing proof that [he] was motivated by malice and not by an otherwise proper purpose." *Medei-*

ros v. Kondo, 55 Haw. 499, 505, 522 P.2d 1269, 1272 (1974); *see also Runnels v. Okamoto,* 56 Haw. 1, 5, 525 P.2d 1125, 1128–29 (1974); *Seibel v. Kemble,* 63 Haw. 516, 522, 631 P.2d 173, 177 (1981).[5]

■ "The existence or absence of malice is generally a question for the jury." *Runnels,* 56 Haw. at 5, 525 P.2d at 1129. However, "when this issue has been removed from the case by uncontroverted affidavits and depositions, and the moving party is entitled to judgment as a matter of law, summary judgment will be granted." *Towse v. State,* 64 Haw. 624, 633, 647 P.2d 696, 703 (1982) (citations and internal quotation marks omitted). In this case, there is no conclusive evidence establishing whether Nakamura acted with or without malice. Thus, the existence of malice in this case is a factual question for the trier of fact.

### B. *Retaliation*

■ To establish a *prima facie* case of retaliation, the plaintiff must prove that (1) she engaged in a protected activity; (2) she was subjected to adverse employment action; and (3) a causal link exists between her participation in the protected activity and the adverse employment action. *See Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 891 (9th Cir.1994); *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987). The Court examines each element in turn.

### 1. **Protected Activity**

Black alleges that she engaged in three protected activities: (1) making informal complaints about Aveiro's conduct to Nakagawa in March 1996 and to Payne in April 1996; (2) filing a formal complaint of sexual harassment on April 16, 1996; and (3) requesting a transfer away from Aveiro's supervisory chain of command. The first two activities are clearly protected

under Title VII; the third is more questionable.

Title VII provides that: "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has *opposed* any practice made an unlawful employment practice ...." 42 U.S.C. § 2000e–3(a) (emphasis added). "Opposed" is the operative term that determines if an employee's activity is protected. Some courts have held that engaging in self-help activity constitutes "opposition." *See Moyo v. Gomez,* 40 F.3d 982 (9th Cir.1994) (defying an employer's order); *Mozee v. Jeffboat, Inc.,* 746 F.2d 365 (7th Cir.1984) (refusing to report to work). Further, courts have held that refusal of sexual advances is sufficient to constitute protected activity. *See Fleming v. South Carolina Dep't of Corrections,* 952 F.Supp. 283 (D.S.C.1996); *Armbruster v. Epstein,* No. Civ. A. 96–CIV–1059, 1996 WL 289991, at *3 (E.D.Pa. May 31, 1996); *Burrell v. City Univ. of New York,* 894 F.Supp. 750, 761 (S.D.N.Y. 1995); *Boyd v. James S. Hayes Living Health Care Agency, Inc.,* 671 F.Supp. 1155, 1167 (W.D.Tenn.1987); *EEOC v. Domino's Pizza,* 909 F.Supp. 1529, 1533 (M.D.Fla.1995); *but see Speer v. Rand McNally & Co.,* No. 95C6269, 1996 WL 667810, at *8, n. 4 (N.D.Ill. Nov. 15, 1996); *Del Castillo v. Pathmark Stores, Inc.,* 941 F.Supp. 437, 438–39 (S.D.N.Y.1996).

■ The evidence suggests that Black requested a transfer from Aveiro's command in order to free herself from his sexual advances and harassment. Avoidance of sexual harassment constitutes opposition to unlawful employment practices. In seeking to escape Aveiro's control, Black affirmatively attempted to end Aveiro's abusive practices. And although opposition of this sort is not as overt as verbal or physical rejection, or even rejec-

---

**5.** The appropriate test for qualified immunity in this case is governed by state law, not federal law. The body of federal law governing qualified immunity applies when the action is brought under 42 U.S.C. § 1983, or

where a federal employee is involved. The claims at issue in the instant motion for partial summary judgment present neither situation.

tion manifested in disobedience, it is still behavior that Aveiro should have comprehended as opposition to his conduct.

### 2. Adverse Employment Action

██ Adverse employment action can support a claim of retaliation. An employment action is adverse for purposes of Title VII if it is "reasonably likely to deter employees from engaging protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000). A hostile work environment also can be the basis for a retaliation claim. *See id.* at 1245. Harassment is actionable if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The harassment must be both objectively and subjectively offensive. *See id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). The totality of the circumstances should be examined to determine whether the environment is sufficiently hostile. *See id.*

Black alleges that Aveiro targeted her for baseless disciplinary action in retaliation for requesting a transfer from Aveiro's command. The elevator incident is one such example. Aveiro accused Black of grabbing him while they were riding in an elevator at the police station. Aveiro ordered Fajardo to "write her up" for the incident. Per Fajardo's orders, an inferior officer issued her a counseling memo. There was no evidence that Black had grabbed Aveiro. It is essentially undisputed that the incident was a prank.

Another incident involved a complaint that Aveiro filed against Black for soliciting donations for the HPD without his permission. In fact, the donations were for a private volunteer group, not the HPD. The origin of the complaint was a local news report stating that Black was soliciting donations on the HPD's behalf. Upon learning of the mistake, the reporter

of the story apologized to the HPD for the error. Nonetheless, an investigation into the complaint ensued. When the complaint came before the ARB for review, Aveiro did not recuse himself from ruling on the complaint, even though he had initiated it. There is evidence that this practice violated procedure. The ARB dismissed the complaint for lack of evidence.

The third example of retaliatory discipline is a counseling memo Black received for failure to keep her office clean. In an annual inspection, IA inspectors had told Black that she needed to clean her office. She apparently acted on that warning, and claims that an IA inspector subsequently found her office in compliance. Fajardo, however, asserts that he found her office "filthy" in his continuing inspection of officers under his command. He ordered an officer to issue Black a counseling memo. Given the conflicting evidence, there are questions of fact regarding the state of Black's office and, relatedly, whether the counseling memo was deserved or merely retaliatory.

Black's complaints of sexual harassment prompted an even more exhaustive number of retaliatory actions. Groundless charges of misconduct continued. An anonymous letter—with Aveiro's fingerprints found on it—accused Black of "kidnapping" a client. The HPD determined that the accusation was meritless, as the client had followed Black voluntarily. There is evidence that someone had tampered with Black's personnel file, as specific commendations she had received could not be found in her file during the IA investigation into her complaint. Perhaps the best example of direct adverse employment action, in Black's view, is the fact that she was put on administrative leave for several weeks in April 1996.

██ The incidents summarized above might well support a finding of adverse employment action, but that is not a determination appropriately made on summary judgment. Material issues of fact remain,

such as the identities of the author of the anonymous letter and the person responsible for removing the commendations from Black's personnel file. Questions of fact also abound regarding the administrative leave. It is uncertain whether the decision to put Black on leave was retaliatory in nature, as there is evidence that it was based on the suggestion of IA investigators that some time off might help Black to ease her stress. Furthermore, Black has not offered sufficient evidence of the economic impact of the leave, if any. More fundamentally, there remains the question of whether the above incidents were reasonably likely to deter Black from engaging in protected activity. The evidence Black presented did not depict employment action so egregious as to merit a determination that they were retaliatory as a matter of law. Material issues of fact precluded a summary judgment finding that Black was the victim of direct adverse employment action.

Black also offered evidence of numerous incidents of alleged retaliation that might best be grouped under the hostile work environment category. Phone calls were a constant source of harassment: Fajardo repeatedly ordered his lieutenants to call Black early in the morning purportedly for work-related reasons. Black claims, and phone records substantiate, that Aveiro's sister called her several times, apparently to persuade her to drop the complaint against her brother. Black received numerous hang-up phone calls and pager messages originating from a medical examiner's office, the mortuary, and the cemetery. Three days after she filed the complaint, she found a note on the windshield of her car reading "Back off cunt."

Purportedly because of the threats, Nakamura initiated Operation Foxtrot, which put Black under 24–hour surveillance for approximately one week. Later into the operation, the HPD placed a wire trap on Black's pager to monitor incoming calls. Nakamura claims that he ordered Operation Foxtrot in response to the note on

Black's car. Black argues that the operation could not have been for her protection because she was not notified of it before it began. There is deposition testimony that the HPD usually notifies a person ahead of time that he or she will be the subject of surveillance or trap for his or her protection. Black also finds it suspicious that the IA team investigating into her harassment complaint was not notified of the operation.

Tension in the workplace escalated after Black filed her complaint. Black claims she was "isolated" from male officers after filing her complaint. An IA investigator testified in his deposition that male officers would not talk to Black unless a female person was present in the room. A police officer allegedly discussed Black's complaint in front of a training academy class, expressing regret that such a complaint could ruin the long career of a senior officer. The practical jokes continued. After Black had transferred from Fajardo's and Aveiro's command, Lau found in her personnel file a workers' compensation form stating that she was mentally incompetent and that she needed mental health care. When asked about the form, Fajardo admitted that it was a joke. Lau destroyed the form because it was inappropriate.

Finally, there is evidence that the HPD released Black's complaint of sexual harassment to the local media. Reporter Leslie Wilcox was given access to the IA report contrary to HPD procedure. There is inconclusive evidence of who was responsible for the leak.

██ Numerous questions of fact surround these allegations of retaliation. As an initial matter, it is questionable whether all of the incidents constitute employment action in the sense that they "alter[ed] the conditions ... of [Black's] employment ...." *Ray,* 217 F.3d at 1245. The isolation from male officers Black experienced amounts at worst to "cold shoulder" treatment from co-workers, which is not actionable retaliation. *See Strother v.*

*Southern Cal. Permanente Med. Group,* 79 F.3d 859, 869 (9th Cir.1996) ("[M]ere ostracism in the workplace is not enough to show an adverse employment decision."). The same logic applies to the training academy incident, which, the Court notes, is based on little more than rumor.

 Similarly, with the exception of the early morning calls placed by Fajardo's subordinates, the remaining prank calls and pages might not qualify as adverse employment action. Identity issues arise again. If the calls and pages are traceable to HPD employees, then there is a strong showing that a hostile work environment existed. But the evidence is inconclusive. It may well be that people not affiliated with the HPD placed the calls. It is even possible that the calls and pages were completely unrelated to Black's complaint. Pending determination of these questions by the trier of fact, there is no certainty that the pranks altered the conditions of Black's employment.

The remaining retaliatory actions could support the finding of a hostile work environment, but they too implicate unresolved questions of fact. For instance, the purpose of Operation Foxtrot is still in dispute. Who was responsible for releasing the IA report to the media is unknown. Consequently, these two adverse acts did not support summary judgment on the retaliation claim either.

 The ultimate question was whether the adverse actions pled by Black were, in their totality, "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ray,* 217 at 1245. The evidence reflects that Black feared for her and her children's safety because of the alleged retaliation. That is her subjective reaction. The incidents of harassment, when viewed objectively, must additionally have changed the conditions of employment and made the work environment abusive. Whether this occurred is for the trier of fact to decide.

**3. Causation**

 Causation can be proven by direct evidence of retaliatory motivation or it may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the activity and the allegedly retaliatory employment decision. *See Miller v. Fairchild Indus., Inc.,* 797 F.2d 727 (9th Cir. 1986).

There is no direct evidence of retaliatory motivation in the record, so Black must prove causation circumstantially. Causation is a factual issue that arose with respect to every incident of retaliation she alleges. The evidence shows that the retaliatory action took place shortly after Black requested a transfer and complained about sexual harassment to her superiors or to the IA. Other events occurred within a more attenuated time frame. Such circumstantial evidence is sufficient to pass the requirement of establishing a *prima facie* case of retaliation, but it is insufficient to entitle Black to summary judgment on the issue of causation.

### C. *Invasion of Privacy*

The Restatement (Second) of Torts categorizes the tort of invasion of privacy into four types: "(1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to the other's private life; and (4) false light." *Mehau v. Reed,* 76 Hawai'i 101, 111, 869 P.2d 1320, 1330 (1994) (quoting Rest. (2d) Torts §§ 652A–E cmt. b (1977)). Black brings her claim of invasion of privacy under the first and third categories.

### 1. Intrusion into Seclusion

One is liable for intrusion into another's seclusion if one "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable per-

son." Rest. (2d) Torts § 652B; *see also Sanders v. American Broadcasting Cos.*, 20 Cal.4th 907, 85 Cal.Rptr.2d 909, 978 P.2d 67, 71 (1999). Black claims that the HPD intruded into her seclusion by putting her under surveillance and placing a wire trap on her pager.

Covert surveillance implicates the privacy interests of individuals in their persons. *See State v. Bonnell*, 75 Haw. 124, 148, 856 P.2d 1265, 1278 (1993) (citing *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir.1991)). Operation Foxtrot was a covert surveillance operation, at least in its inception. Accordingly, the operation may have infringed on Black's right to privacy. However, two issues need to be resolved in Black's favor before she can prevail on her claim of intrusion. The first is whether the surveillance was "highly offensive" to a reasonable person. The second is consent.

Whether an act of intrusion is highly offensive is an objective inquiry. *See* Rest. (2d) Torts § 652B cmt. c; *see also Shulman v. Group W Prods., Inc.*, 18 Cal.4th 200, 74 Cal.Rptr.2d 843, 955 P.2d 469, 490 (1998). There is no bright line rule delineating what kind of intrusion is "highly offensive," as "each case must be taken on its facts." *Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F.3d 1078, 1089 (9th Cir.1999) (internal quotation marks omitted) (quoting *Shulman*, 74 Cal.Rptr.2d 843, 955 P.2d at 494).

■ As noted above, the impetus for Operation Foxtrot is a subject of dispute. Black asserts that the operation was intended to harass her. The HPD and Nakamura claim that the aim of the operation was to protect Black in light of the threatening note, calls, and pages she received. Black counters that if the operation was

for protective purposes, she should have been notified and afforded the opportunity to consent before it began. The inquiry into whether Operation Foxtrot was highly offensive may thus be divided into two questions. First, would a reasonable person find the surveillance operation highly offensive given threats of the kind Black received? Second, would a reasonable person find the operation highly offensive if she was not given prior notice of the operation? Both were factual questions that precluded summary judgment.

Regarding the issue of consent, the HPD and Nakamura appear to argue that Black either consented to Operation Foxtrot after she uncovered it, or that she waived her right to privacy,[6] as evidenced by the fact that she frequently talked to the surveillance team, brought them food and drink, and cooperated with the operation. Black of course opposes this interpretation of her reaction to the surveillance team and maintains vigorously that she neither consented to the operation nor waived her right to privacy.

■ The right to privacy may be waived or lost through a course of conduct estopping its assertion if the complaining party displays a clear, unequivocal, and decisive act of waiver. *See Veilleux v. National Broadcasting Co., Inc.*, 8 F.Supp.2d 23, 40 (D.Me.1998); *Rueffert v. State*, 46 Ala.App. 36, 237 So.2d 520, 522 (1970); *Anderson v. Low Rent Housing Comm'n of Muscatine*, 304 N.W.2d 239, 249 (Iowa 1981); *Doe v. Mills*, 212 Mich. App. 73, 536 N.W.2d 824, 831 (1995); *see also Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir. 1991) (stating that constitutional rights may ordinarily be waived by clear and

---

6. The Court can discern no difference between "consenting" to an invasion of privacy and "waiving" one's privacy interest. *See United States v. Leary*, 846 F.2d 592, 598 (10th Cir.1988) ("When evaluating fourth amendment rights, there is no clear distinction between 'consent' to a search and a 'waiver' of one's privacy interest."). Although *Leary* speaks of the federal right of privacy under the Fourth Amendment of the United States Constitution, its holding is relevant to the right of privacy in Hawaii since Article I, Section 6 of the Hawaii Constitution was patterned in part after the Fourth Amendment. Accordingly, the Court will consider the arguments regarding waiver and consent as interchangeable.

convincing evidence that the waiver is voluntary, knowing, and intelligent); *Brown v. Thompson*, 91 Hawai'i 1, 10 n. 9, 979 P.2d 586, 595 n. 9 (same). The burden of proof is on the party claiming waiver. *See Rueffert*, 237 So.2d at 522. However, courts indulge in every reasonable presumption against waiver of fundamental constitutional rights. *See Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), *overruled on other grounds, Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The question of waiver is usually one for the trier of fact, but where the evidence is not in dispute, the question becomes one of law for the court. *See Anderson*, 304 N.W.2d at 249.

Here, the alleged acts of waiver are not in dispute. The only question is whether they are sufficient to constitute a clear, unequivocal decision to waive the right to privacy. They are not. Black did not abandon her right to privacy by being friendly to the officers ordered to surveil her. At best, she was trying to make an uncomfortable situation less awkward. On the issue of waiver and consent, Defendants' argument fails as a matter of law.

We now turn to the wire trap on Black's pager. Pursuant to Article I, Section 6 of the Hawaii Constitution, individuals in Hawaii have a reasonable expectation of privacy with respect to the outgoing telephone numbers they call and the incoming telephone numbers they receive on their private telephone lines. *See State v. Rothman*, 70 Haw. 546, 556, 779 P.2d 1, 7 (1989). In protecting this right, the Hawaii Supreme Court has held that a warrant issued by a circuit court is required to install a device such as a wire trap. *See id.* at 557, 779 P.2d at 8 (holding that a warrant issued pursuant to HRS § 603-21.9(6) is required for installation of devices monitoring incoming or outgoing telephone numbers). The HPD did not first obtain a warrant before installing the wire trap on Black's pager.

The warrantless trapping of Black's pager would seem to be a per se violation of Black's right to privacy but for the unresolved issue of whether Black had a legitimate expectation of privacy with respect to incoming telephone numbers on her pager. The evidence is conflicting on the question of who owned the pager. The HPD states that it had issued the pager to Black, and as such, it may place a trap on it as it wished. Black testified in her deposition that she had replaced the HPD-issued pager, which had broken, with her own. The evidence does not show, however, whether it was Black's personal pager or the HPD-issued pager that was trapped. If the latter, Black cannot claim a reasonable expectation of privacy because the pager does not operate on a private line. This is yet another question of fact that precluded summary judgment on the intrusion claim.

### 2. Unfair Publicity

The tort of unfair publicity is actionable if the plaintiff demonstrates that the defendant engaged in (1) public disclosure (2) of a private fact regarding the plaintiff (3) which would be offensive and objectionable to the reasonable person, and (4) which is not of legitimate public concern. *See Shulman*, 74 Cal. Rptr.2d 843, 955 P.2d at 478. Black claims that the HPD disclosed private facts about her to the public when it gave the local media access to the IA report on her complaint. The record establishes that someone released the IA report; the identity of the person responsible for the disclosure remains a mystery even after the conclusion of a six-month internal HPD investigation. There is conjecture that someone in the HPD is the culprit, but no substantial evidence supports this conclusion. Therefore, Black did not provide enough evidence to demonstrate as a matter of law that the HPD is liable for the tort of unfair publicity.

### D. Failure to Remedy Harassment

Count 17 of the first amended complaint alleges failure to remedy harassment as a separate cause of action against the HPD. In controversy is whether the cause of action is maintainable.

In *EEOC v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir.1989), the Ninth Circuit held that "employers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Id.* at 1515–16. Two years later, the Ninth Circuit defined an employer's remedial obligation in *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991). Remedies should be "reasonably calculated to end the harassment." *See id.* at 882. The reasonableness of the employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. *See id.* In evaluating the adequacy of the remedy, the court is also to take into account the ability of the remedy to persuade potential harassers from unlawful conduct. *See id.* In *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir.1995), the Ninth Circuit clarified the appropriate test for the employer's liability for failure to remedy or prevent a hostile or offensive work environment. An employer is not free from liability just because the harassment has stopped. The employer has an obligation to remedy and *deter* sexual harassment. The court articulated a two-part test for determining whether the employer has discharged its obligation to remedy: (1) the remedy's ability to stop harassment by the person who engaged in harassment, and (2) the remedy's ability to dissuade potential harassers from unlawful conduct. *See id.* at 1528–29. An employer's actions will not necessarily shield it from liability if harassment continues. *See id.* at 1529 (citing *Intlekofer v. Turnage*, 973 F.2d 773, 780–81 (9th Cir.1992)).

■ In 1998, the Supreme Court decided two Title VII cases that changed the analytical framework. *See Burlington In-*

*dus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662. *Burlington* and *Faragher* held that an employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the victimized employee. *See Burlington*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. *See Burlington*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. The defense has two elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Burlington*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. However, no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Burlington*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

■ In light of *Burlington* and *Faragher*, an employer's failure to remedy or deter harassment does not give rise to a cause of action separate from the employer's vicarious liability for sexual harassment. Employer action that remediates and deters harassment may support an affirmative defense to vicarious liability. Failure to take such action renders the defense unavailable to the employer, but it does not serve as the basis for an independent cause of action. *See Brooks v. City of San Mateo*, 214 F.3d 1082, 1092 n. 8 (9th Cir.2000) ("In any case, *Fuller* does not establish a cause of action that is separate

from that for a hostile work environment or quid pro quo harassment."). Therefore, Black cannot maintain an independent cause of action for failure to remedy harassment.

Black warns that refusal to recognize an independent duty of remediation and deterrence would permit employers to do nothing until the employee proves her underlying claims of harassment. Contrary to Black's suggestion, the employer has no incentive to sit idly by while the employee collects proof of harassment. It is in the employer's best interest to take swift action to remedy and prevent harassment so that it may avail itself of the *Burlington/Faragher* affirmative defense.

Black moved in the alternative for summary judgment on the issue of the viability of the remedy and deterrence defense in this case. In the interest of judicial efficiency, the Court reserves ruling on the issue. Analysis of the defense presupposes the existence of actionable hostile work environment, a cause of action that is not at issue in any of the instant motions. The hostile work environment claim and the relevant defenses thereto will be considered when they are squarely before the Court.

Black's motion for partial summary judgment was therefore DENIED.

### III. *NAKAMURA'S COUNTERMOTION FOR PARTIAL SUMMARY JUDGMENT*

■ Nakamura moved for partial summary judgment on the claims premised under Title VII and chapter 378 of the Hawaii Discriminatory Employment Practices Act ("HDEPA"). This Court has already ruled that although individual employees may be "agents" of employers for purposes of imputing liability, individual employees, including supervisors and managers, are not personally liable as "employers" under Title VII. *See Greenlaw* 59 F.3d at 1001 ("Under Title VII there is no personal liability for employees, including supervisors."); *see also supra* at ——.

Accordingly, Nakamura is not an "employer" who can be held liable under Title VII.

The Court next considered whether personal liability attaches under the HDEPA. There is no authority directly on point. It is true that reliance on federal decisions construing Title VII is proper in the absence of relevant Hawaii case law. *See Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649. Nonetheless, Title VII and the HDEPA are not interchangeable. For instance, the definitions of "employer" in the two statutes, which trigger liability for unlawful employment practices, are not identical. *Compare* Haw.Rev.Stat. § 378–1 *with* 42 U.S.C. § 2000e–2; *see also Furukawa*, 85 Hawai'i at 13, 936 P.2d at 649 (noting that, unlike Title VII, the HDEPA extends protection against employment discrimination to all employees, not just employees of employers with fifteen or more employees).

Nakamura points out that the remedies under the HDEPA are identical to those available under Title VII. *See Sam Teague, Ltd. v. Hawai'i Civil Rights Comm'n*, 89 Hawai'i 269, 281, 971 P.2d 1104, 1116 (1999) (citing H. Stand. Comm. Rep. No. 549, 1981 H.J. at 1166 and S. Stand. Comm. Rep. No. 1198, 1981 S.J. at 1363). Although that is true, there is a fundamental difference between liability and remedy. Commonality of remedies does not dictate that the standards of liability be similarly identical.

■ Most pertinent to the issue is a body of decisions issued by the Hawaii Civil Rights Commission which suggests that an individual employee may be held liable for violations of the HDEPA. *See, e.g., Tseu v. Cederquist, Inc.*, No. 95–001–E–R–S (HCRC June 28, 1996); *Santos v. Niimi*, No. 92–001–E–SH (HCRC Jan. 25, 1993). In these cases, the Commission held the individual harassing employee jointly and severally liable for damages arising from the harassment. In *Steinberg v. Hoshijo*, 88 Hawai'i 10, 19, 960 P.2d 1218, 1227 (1998), the Hawaii Supreme

Court upheld the Commission's imposition of joint and several liability on an employee. This is a strong indication that the Hawaii Supreme Court would interpret the HDEPA to hold individual employees liable if the issue were put before it. Accordingly, Nakamura can be held individually liable under the HDEPA barring the application of other defenses.

Therefore, Nakamura's countermotion for partial summary judgment was GRANTED as to the Title VII claims and DENIED as to the HDEPA claim.

## IV. *FAJARDO'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

Fajardo moved for partial summary judgment on Count 5 (retaliation), Count 8 (conspiracy to interfere with civil rights), Count 9 (IIED), and Count 15 (negligence to prevent discrimination) of the first amended complaint.

### A. *Retaliation*

Fajardo argues that Black cannot establish a *prima facie* case of retaliation as a matter of law because no adverse employment action was taken against her. As discussed above, material issues of fact preclude summary judgment on this issue. *See supra* at 1050–52.

Fajardo's next argument is that his actions were intended to help Black adjust to the structure of the HPD, not to discipline her. The evidence could establish that a legitimate nondiscriminatory reason supported Fajardo's actions. However, Black has offered sufficient evidence of pretext. It is for the trier of fact to decide whether Fajardo's stated reason for his actions were pretextual.

### B. *§ 1985(3)*

■ Fajardo argues that Black's § 1985(3) claim fails because " § 1985(3) may not be invoked to redress violation of Title VII." *Great Am. Fed. Savs. & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). A public employer who discriminates based on prohibited criteria (e.g., gender, race, religion) may be liable for violating the federal constitution as well as Title VII. *See Ratliff v. City of Milwaukee,* 795 F.2d 612, 623–24 (7th Cir.1986). Title VII does not preempt an action under § 1983 for a violation of the Fourteenth Amendment. *See Roberts v. College of the Desert,* 870 F.2d 1411, 1415 (9th Cir.1988) (citing *Ratliff* with approval). Thus, although *Novotny* holds that § 1985(3) is not a remedy for Title VII violations, it does not bar a plaintiff from bringing a § 1985(3) claim premised on violations of federal constitutional rights. The rule in *Novotny,* which involved discrimination by a private employer, is inapplicable to a government employee who alleges violations of § 1983 against her employer. Since Black asserts a § 1983 claim against Fajardo, she may assert a conspiracy claim under § 1985(3).

■ Fajardo also contends that Black cannot satisfy the elements of a conspiracy claim as a matter of law. The elements of a § 1985(3) claim are: (1) the existence of a conspiracy to deprive the plaintiff of the equal protection of the laws; (2) an act in furtherance of the conspiracy; and (3) a resulting injury. *See Addisu v. Fred Meyer,* 198 F.3d 1130, 1141 (9th Cir.2000) (citing *Scott v. Ross,* 140 F.3d 1275, 1284, *reh'g denied,* 151 F.3d 1247 (9th Cir.1998)).

Fajardo asserts that there is no evidence that he and Aveiro had conspired to deprive Black of her civil rights. He maintains that there is no evidence that he even knew about the relationship between Black and Aveiro prior to the filing of her complaint in April 1996. He further explains that the disciplinary actions he took against Black were legitimate.

■ The evidence shows that Fajardo referred to Aveiro as Black's "boyfriend" on one occasion, and that Black had submitted numerous requests to transfer out of Aveiro's command. At minimum, this evidence raises the factual question of the extent of Fajardo's knowledge of the rela-

tionship between Aveiro and Black. As to whether the disciplinary action was legitimate, that too is a question of fact.

### C. *§ 1986*

Fajardo contends that Black's § 1986 claim must fail if her § 1985(3) claim failed. Because the conspiracy claim is viable, the argument has no merit.

### D. *IIED*

The starting point in Fajardo's argument concerning the IIED claim is that Hawaii's workers' compensation statute governs the claim. Continuing the argument, Fajardo contends that Black cannot meet the standard established in *Iddings v. Mee–Lee*, 82 Hawai'i 1, 919 P.2d 263 (1996), for maintaining an action against a co-employee.[7] The exclusivity provision of the workers' compensation statute contains an exception for emotional distress claims premised on sexual harassment or sexual assault. Given this Court's ruling that the exception encompasses both IIED and NIED claims, *see supra* at 1047–48, Fajardo's reliance on *Iddings v. Mee–Lee* is misplaced.

Accordingly, Fajardo's motion for partial summary judgment was DENIED.

---

**7.** Hawaii's workers' compensation statute prohibits lawsuits by an injured employee against "another employee of the employer acting in the course and scope of his employment," except where the personal injury was caused by the co-employee's "wilful and wanton misconduct." Haw.Rev.Stat. § 368–8. *Iddings* held that the "wilful and wanton misconduct" exception is limited to conduct that is either (1) motivated by an actual intent to cause injury; or (2) committed in circumstances indicating that the injuring employee (a) has knowledge of the peril to be apprehended, (b) has knowledge that the injury is a probable, as opposed to a possible, result of the danger, and (c) consciously fails to avoid the peril. *Iddings*, 82 Hawai'i at 12, 919 P.2d at 274.