**B.K.B., Plaintiff–Appellant–
Cross–Appellee,**

v.

**MAUI POLICE DEPARTMENT,
County of Maui, Defendant,**

**County of Maui, Defendant–Appellee–
Cross–Appellant.**

**Nos. 99–17087, 99–17158.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 17, 2001

Filed Jan. 9, 2002

Amended Feb. 20, 2002.

Gerald T. Johnson, Wailuku, Hawaii, for the plaintiff-appellant/appellee.

Richard Rand, Honolulu, Hawaii, for the defendant-appellee/appellant.

Before: B. FLETCHER, CANBY, and PAEZ, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

Plaintiff-appellant B.K.B. raises two issues on appeal: (1) whether appellant sufficiently exhausted administrative remedies on her statutory employment discrimination claims and (2) whether the trial court abused its discretion in failing

to grant a mistrial where serious violations of Rule 412 of the Federal Rules of Evidence occurred. The Maui Police Department ("the Department") and the County of Maui ("the County") offered defense testimony, which the district court admitted, relating to appellant's sexual practices and history. We agree with the appellant that the testimony should not have been admitted and was highly prejudicial. The County cross-appeals the district court's award of sanctions as an abuse of discretion. We affirm the court's imposition of sanctions. We also hold that Plaintiff's statutory claims of sexual harassment should not have been dismissed pre-trial. Accordingly, we reverse and remand for a new trial.

## I. BACKGROUND

### A. *Plaintiff's filing of discrimination charges*

Plaintiff, a 49–year old white female police officer, awoke one morning in April 1997 with heavy bleeding and subsequently collapsed while responding to a radio call in the course of her duties working at the Lahaina station of the Maui Police Department. Two years prior, Plaintiff had been diagnosed with a low platelet disorder called idiopathic thrombocytopenia purpura ("ITP") and as a result had been assigned to "light" duty, including a primary assignment to reorganize and maintain the Department's long-neglected evidence room. Plaintiff's collapse followed an altercation with her supervisor, Sergeant

Kenneth Kikuchi, with whom her relationship had so deteriorated that she felt unable to request relief from the call. Plaintiff was subsequently ordered by Captain Robert Tam Ho to write a memorandum (known as a "to-from") detailing the stressors that had led to her collapse. In the to-from, Plaintiff claimed that subsequent to her assignment to the evidence room she had become the victim of repeated acts of harassment and discrimination.[1] That same week, on the captain's orders, Kikuchi was transferred to another shift; eventually, he was disciplined and left the police force.

In November 1997, Plaintiff filed a "Charge of Discrimination" with the Hawaii Civil Rights Commission ("HCRC"). This filing also triggered the administrative review process for her federal discrimination claims. Plaintiff checked boxes on the charge form and in the pre-complaint questionnaire indicating discrimination and harassment based on race, color, and sex. On the pre-complaint questionnaire, Plaintiff was asked to "include examples" of discrimination. She stated that "I am referred to as 'Haole' and given the finger at work. I am 'iced-out' by fellow officers and this continues."[2] On the charge form, Plaintiff alleged that she was "being subjected to harassment because of my race (Caucasian) and in retaliation for my opposing the discriminatory harassment." Plaintiff further specified that she had been verbally harassed by Sergeant Kikuchi, and thereby subjected to a hostile and intimidating work environ-

---

1. As a result of the Department's attempt to achieve accreditation for its evidence room, security measures were implemented requiring that only Plaintiff and Captain Tam Ho would have access to the room. This allegedly frustrated her coworkers, resulting in acts of sabotage that included officers cutting locks and installing new locks for which Plaintiff did not have a key. Plaintiff also alleged in her to-from that after her custodial

assignment, she became the recipient of hostile racial remarks as well as being ostracized by other officers.

2. "Haole" is a Hawaiian term, sometimes used derogatorily, referring to persons of the Caucasian race. By the phrase "iced-out," Plaintiff intended to indicate that she was ostracized by fellow officers who gave her the silent treatment.

ment. In addition, she contended that after her memorandum to Captain Tam Ho, she was subjected to retaliation and further harassment.

The EEOC and HCRC issued Plaintiff a right-to-sue letter without investigating her claims. Plaintiff originally filed suit in state court, claiming federal and state violations of race and sex discrimination laws (including racial and sexual harassment), unlawful retaliation, violations of the state whistleblower statute, and infliction of emotional distress. Her action was later removed to federal court. Karl Sakamoto, an employee of the HCRC, filed a declaration with the district court stating that "Complainant's Right to Sue was intended to afford her a lawsuit involving harassment on the protected basis of race, color, and sex as indicated on the Pre–Complaint Questionnaire ... and the [charge]." Nevertheless, the district court dismissed Plaintiff's federal and state statutory sexual harassment claims prior to trial, on the ground that she had waived them by failing to raise them adequately in her charge. The district court did permit her to proceed with a Hawaii common law sexual harassment claim, though such a claim had never been pleaded in Plaintiff's complaint.

### B. The trial testimony and alleged violation of Rule 412

At trial, Plaintiff testified that pornographic magazines were displayed as "part of a normal routine" at the police station, along with pornographic films, and that occasionally she would be compared by the male officers to the pictures in the magazines or asked if she could perform the acts depicted in the films. Plaintiff also testified that during her police academy training, all of the recruits were taught about the "code of silence" that functioned as an unwritten department policy against speaking out against fellow officers.

Plaintiff further testified that Deputy Chief of Police Lanny Tihada had harassed her from the time she was a recruit and eventually raped her on three occasions. Plaintiff claimed that her first encounter with Tihada took place when she was a recruit in 1991; Tihada allegedly took her on a drive and propositioned her, saying that he "liked [her] ass and [her] long blond hair." On the first occasion that Tihada allegedly raped Plaintiff in 1994, he came to her home and threatened her, warning that because he "owned" the department, and she was "just a fucking woman, no one will believe you and your career will be over." In December 1995, after being placed on light duty due to her ITP, Tihada allegedly announced in front of everyone, jokingly, that he didn't know how much longer he could hold off personnel, and that "unless you are able to do the job you were hired for, ... you're going to be terminated." Tihada followed that threat with another visit to Plaintiff's home that evening, during which he allegedly forced himself on her again. Finally, in March 1996, after allegations from several women of sexual harassment against Tihada had appeared in the press,[3] he allegedly appeared at Plaintiff's home and raped her yet again, this time in front of Plaintiff's daughter.

Plaintiff also testified that following her submission of the to-from in April 1997, her fellow officers and supervisors began to retaliate against her for breaking the code of silence. In addition to being called a "fucking haole," Plaintiff testified that sergeants and officers would call her "Sylos" or "Kidnay sister," referring to other officers who had filed discrimination claims against the Department. Plaintiff was also repeatedly given the finger, called a "fucking cunt" or "fucking bitch," "clicked" (i.e., insulted by other officers who would click their transmitters when she came on

**3.** Tihada resigned in 1996 following these highly publicized allegations.

the police radio), and iced out. This behavior continued and even escalated after an internal affairs investigation was begun in June 1997. Plaintiff estimated that she was subjected to racial remarks on a daily basis, and to sexual comments an average of two out of three days.[4] Finally, and perhaps most disturbingly, Plaintiff testified that on at least three occasions, she failed to receive backup in response to emergency calls.[5] Eventually, in October 1997, Plaintiff suffered another collapse, resulting in her leaving work for good.

In defense, the County presented its own psychologist who testified that Plaintiff was faking most of her symptoms, which were largely due to stress from her medical and financial problems, and that she exhibited a histrionic personality. With respect to Tihada, the defense attempted to discredit Plaintiff's testimony by showing that inconsistencies in her own purported conduct impugned the credibility of her story. For example, Plaintiff never reported the alleged rapes at the time they

happened, nor was she able to produce any friends who could testify that she had confided in them about the alleged incidents. Tihada himself testified that he had sex with Plaintiff on two occasions, but that these encounters had been consensual and at her initiation. Officer Rocky Lassiter corroborated Tihada's account of how on one occasion Plaintiff handed him her phone number at a party and asked him to call her. The defense also pointed to testimony from other witnesses that Plaintiff found Tihada to be very good-looking, popular, and powerful, and that she was flattered by his attention.

On the penultimate day of trial testimony, the County presented Officer Jamie Becraft as a witness. Becraft initially testified that he and Plaintiff were close friends and that he had helped her in numerous ways during her bout with ITP while on the police force. However, Becraft further testified that, following a get-well party at Plaintiff's house, he and a fellow officer, Micah Adams, found them-

---

4. In addition to her own testimony, Plaintiff's case consisted of testimony from a number of other witnesses. Malia Chun testified about incidents of sex discrimination and harassment during police training and on the job, including retaliation in the form of clicking and lack of backup after she had filed a formal complaint against a supervisor. Stacy Sylos testified to the Department's inculcation of a code of silence during recruit training, the showing of pornography at Lahaina station, as well her experiences with verbal harassment and retaliation for filing a complaint, including clicking and lack of backup. Further, Sylos related incidents in which a condom, a picture of a half-dressed teenage boy, and a pendant in the form of a phallic object were placed in her mail slot. Sylos also witnessed and corroborated Plaintiff's account of the incident at the station where Tihada allegedly grabbed her breast.

Several other women testified about incidents of sexual harassment involving Tihada. In addition, John Kidnay, a male Caucasian police officer, corroborated Plaintiff's account

of harassment in the department, including the showing of pornography and Sergeant Kikuchi's improper conduct. Finally, Dr. Riggs Roberts, a psychiatrist who had treated Plaintiff for over a year and a half, testified that he believed that as a result of her experiences in the police department, Plaintiff had suffered "very severe" emotional distress involving post-traumatic stress disorder ("PTSD"), which aggravated her low platelet disorder.

5. On one occasion, she learned that Officer Dods had ordered a police recruit she was partnered with to go and park their cruiser before assisting her on a dangerous call, thereby leaving her without support. When she tried to complain about the incident, Lieutenant Blair (who was also the acting police captain at that time) allegedly told her that "after what you've done, you can't expect to be welcomed back in this district with open arms." Blair also told her that her beat partners would not back her up anymore, and that he "[couldn't] guarantee [her] safety any longer."

selves too drunk to drive and decided to spend the night. Becraft testified that, after everyone else had left the party, he, Adams, and Plaintiff were alone in the living room. Defense counsel then asked whether "anything unusual happened that night." At this point plaintiff's counsel requested a short sidebar with the trial judge, during which time Plaintiff's lawyer requested an offer of proof, and defense counsel averred that "[i]t's not going to get into any issue of sexual acts between Officer Plaintiff and this man." Satisfied, the district court allowed the testimony to continue.

Immediately thereafter, Becraft testified that Plaintiff "turned the conversation to sex," whereupon Plaintiff's lawyer again objected on Rule 412 grounds. The district court overruled the objection. Becraft went on to testify that Plaintiff proceeded that night to describe her use of ben-wa balls (a female sexual device) to stimulate herself, and that unbeknownst to him, Plaintiff had once had an orgasm while using the device and thinking of him at work. Becraft also testified that Plaintiff modeled lingerie in front of them, told Becraft that she liked younger men, that she thought he would be fun in bed, and that she wanted to teach him things and "hurt" him. Becraft claimed that he and Adams were "flabbergasted" and wanted "to find a way to get out of there," but eventually fell asleep and left the next morning.

Another bench conference then ensued, at which the trial judge stated, "I'm a little concerned that Mr. Johnson [Plaintiff's counsel] may, indeed, have had a point about a Rule 412 issue with the testimony that has just come out and what is going to come out now." The court then ordered counsel to present arguments the next morning as to why Rule 412 did not apply and why defense counsel had not raised this testimony in a motion at least fourteen days prior to trial.

The following morning, before the trial resumed, Plaintiff's counsel moved for a mistrial, which was denied by the district court. The trial judge conceded that Becraft's testimony "was harmful," and "I am certain that the jurors paid a lot of attention to this testimony. I am certain they haven't forgotten it." The court further stated that "I think this was a violation of Rule 412," and that "[i]t may well subject the County to sanctions." Nonetheless, the court opined that "to declare a mistrial at this point is such a severe sanction that I think that the damage can instead be addressed with a less drastic step, and that is the striking, which I intend to do, and the possibility of sanctions...." As a result, the trial judge provided a lengthy curative instruction and ordered a partial striking of Becraft's testimony, in an "attempt to address the harm that, I think, was unfairly put upon the plaintiff."[6] The

**6.** The court instructed the jury as follows:
Yesterday Officer Becraft presented some testimony about statements he said [Plaintiff] made to him about her alleged use of some sexual devices. That testimony is stricken. That means you are to disregard that testimony entirely and to treat it as if you had never heard it.
By that I mean, you are not to think that [Plaintiff] ever made that statement to Mr. Becraft or to Officer Adams, or to anyone else then or ever. You are not to think that she performed the acts that Officer Becraft

claimed that she had performed. You are not to assume that [Plaintiff] welcomed or tolerated comments or actions of a sexual nature by others, either in the workplace or in work-related activities, or with other work colleagues. You are not to assume that she tolerated that just because she allegedly made these comments to Officer Becraft.
Instead, you are to totally put these comments out of your mind and you are not to speculate as to the reason that I am giving you this instruction.

jury eventually returned a verdict for the defendants on all counts. After the trial, Plaintiff's attorneys renewed their motion for a mistrial and a new trial, which was again denied.

The district court subsequently imposed $10,000 in sanctions against the County for violating Rule 412—$5,000 to compensate Plaintiff for the pain and suffering caused by the public embarrassment resulting from Becraft's testimony, and $5,000 to cover the additional attorney's costs generated by the issues raised by the improper admission of the testimony.

## II. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

As discussed above, the district court dismissed Plaintiff's federal and state statutory claims at summary judgment on the ground that Plaintiff had failed to exhaust administrative remedies by neglecting to include specific allegations of sexual harassment in her charge submitted to the HCRC.

 We review the district court's order granting summary judgment *de novo. Robi v. Reed,* 173 F.3d 736, 739 (9th Cir. 1999). In addition, we review *de novo* the district court's determination that it did not have jurisdiction to hear appellant's statutory sexual harassment claims due to her failure to exhaust. *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 899 (9th Cir.1994). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 In order to establish subject matter jurisdiction over her Title VII claim, Plaintiff was required to exhaust her administrative remedies. *Farmer Bros.,* 31 F.3d at 899. Under Title VII, a plaintiff must exhaust her administrative remedies by filing a timely charge with the EEOC, or the appropriate state agency, thereby affording the agency an opportunity to investigate the charge. 42 U.S.C. § 2000e–5(b). "The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.' " *Park v. Howard Univ.,* 71 F.3d 904, 907 (D.C.Cir.1995) (quoting *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 472 n. 325 (D.C. Cir.1976)); *see also Babrocky v. Jewel Food Co.,* 773 F.2d 857, 863 (7th Cir.1985) ("Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge. . . ."). For these reasons, Title VII requires that the charge be sworn, 42 U.S.C. § 2000e–5(b) ("Charges shall be in writing under oath or affirmation . . . ."), and that the EEOC send notice of the charge to the named respondent. *Id.* (stating that the EEOC "shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee . . . within ten days").

 The EEOC's failure to address a claim asserted by the plaintiff in her charge has no bearing on whether the plaintiff has exhausted her administrative remedies with regard to that claim. *Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1480 (9th Cir.1997). Similarly, as in the present action, whether

the EEOC in fact conducted *any* investigation at all is not material for purposes of exhaustion. *Cf. Martin v. Nannie & the Newborns, Inc.,* 3 F.3d 1410, 1413, 1416 n. 7 (10th Cir.1993) (where the EEOC "did not complete an investigation" plaintiff nevertheless succeeded in exhausting claims reasonably related to the allegations included in her EEOC charge). Subject matter jurisdiction extends over all allegations of discrimination that either "fell within the scope of the EEOC's *actual* investigation or an EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination." *Farmer Bros.,* 31 F.3d at 899(emphasis in the original) (internal quotations omitted); *see also Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir.1990) ("The jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation.").

■■■■ We construe the language of EEOC charges "with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." *Kaplan v. Int'l Alliance of Theatrical & Stage Employees,* 525 F.2d 1354, 1359 (9th Cir.1975) *abrogated on other grounds by Laughon v. Int'l Alliance of Theatrical Stage Employees,* 248 F.3d 931 (9th Cir. 2001); *cf. Love v. Pullman Co.,* 404 U.S. 522, 527, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) (stating that "technicalities are particularly inappropriate in a statutory scheme [such as Title VII] in which laymen, unassisted by trained lawyers, initiate the process"). "[T]the crucial element of a charge of discrimination is the factual statement contained therein." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 462 (5th Cir.1970); *accord Kaplan,* 525 F.2d at 1359. Allegations of discrimination not included in the plaintiff's administrative charge "may not be considered by a federal court unless the new claims are 'like or reasonably related to the allegations contained in the EEOC charge.'" *Green v.*

*Los Angeles County Superintendent of Schs.,* 883 F.2d 1472, 1475–76 (9th Cir. 1989) (quoting *Brown v. Puget Sound Elec. Apprenticeship & Training Trust,* 732 F.2d 726, 729 (9th Cir.1984)); *see also Anderson v. Reno,* 190 F.3d 930, 935 (9th Cir.1999); *Sosa,* 920 F.2d at 1456. In determining whether a plaintiff has exhausted allegations that she did not specify in her administrative charge, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred. In addition, the court should consider plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case. *See Farmer Bros.,* 31 F.3d at 899 (ruling that plaintiff exhausted her claim for discriminatory layoff since that claim was always a part of the plaintiff's theory of the case as expressed in her explicit allegations of discriminatory failure to recall and to rehire laid-off female employees).

Here, Plaintiff checked boxes indicating that she believed that she had been subjected to discrimination based on "race," "sex," and "national origin" and that she believed that she had been subject to "harassment." However, her development of the facts supporting these allegations was exceedingly sparse. In her charge, Plaintiff lists what she calls allegations of "race and retaliation harassment," including harassment "of a verbal nature" perpetrated by Sergeant Kikuchi and "further harassment" following her submission of a formal complaint memorandum to Captain Tam Ho. Defendants argue that these allegations are insufficient to encompass Plaintiff's claims of sex discrimination and sexual harassment because, while they are

specific with respect to the identity of one alleged perpetrator, they do not specify that the form of the harassment was sexual.

Plaintiff argues that we should look not only to the charge itself but also to the allegations made in her pre-complaint questionnaire in order to determine the scope of her charge. Some of the examples of harassment detailed by Plaintiff in her pre-complaint questionnaire (e.g., being called "fucking Haole," given the finger, and "iced out"), encompass harassment on the grounds of both race *and* gender. *Cf. Sanchez*, 431 F.2d at 462–64 (ruling that factual allegations in the charge describing instances of physical harassment and discriminatory denial of compensation were capable of supporting claims of both sex and national origin discrimination); *see generally* Kimberle Crenshaw, *Mapping the Margins: Intersectionality, Identity Politics, and Violence Against Women of Color*, 43 Stan. L. Rev. 1241 (1991) (discussing the intersectional relationship between discrimination on the basis of race and gender). There are numerous examples in the federal courts where harassment because of "race" has been allegedly perpetrated by subjecting plaintiffs to behavior deploying sexual or gender-based idioms in order to express contempt or ridicule or in order to threaten violence, *see, e.g., Hafford v. Seidner*, 183 F.3d 506, 509, 513 (6th Cir.1999) (reversing grant of summary judgment against claims of racial harassment where male African–American corrections officer, in addition to other threats, received harassing phone call saying "You wanta swang, bitch" and plaintiff interpreted this as a threat of lynching); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417, 423 (7th Cir.1989) (holding that plaintiff established discriminatory constructive discharge "because of race" where a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the act depicted therein, grabbed the plaintiff and threatened to kill her), and, conversely, where harassment because of "sex" might be perpetrated by exposing plaintiffs to racially antagonistic or demeaning behavior, *see, e.g., Hill v. Am. Gen. Finance, Inc.*, 218 F.3d 639, 641, 644 (7th Cir.2000) (ruling that claims of racial and sexual harassment were substantiated by allegations that plaintiff's supervisor made statements such as "once you go black, you never go back" while rubbing against her buttocks and "this ain't no Aunt Jemima office" in reference to the use of vernacular English, but affirming summary judgment based on employer's affirmative defense of prompt remediation). Such a confluence of race and sex-based harassment is equally possible in a reverse discrimination context. *See, e.g., McCoy v. Johnson Controls World Servs.*, 878 F.Supp. 229, 231–232 (S.D.Ga.1995) (finding that racial and sexual harassment claims survived Rule 12(b)(6) motion to dismiss where white female security guard alleged that black female co-workers referred to her as "stupid poor white bitch," "stupid poor white trash," told her that they would coerce her to quit and subjected her to sexual assault).

The allegations made by Plaintiff in her pre-complaint questionnaire certainly provide additional detail to the allegations of harassment of which the HCRC was on notice. We note that, because the charge is intended to satisfy the *dual* purpose of establishing notice of the complainant's claims both to the agency *and* to the named respondent, review of a plaintiff's pre-complaint questionnaire in order to determine the scope of the charge may impair part of its statutory purpose. Only the charge is sent to the respondent; the questionnaire is not. However, we do not take the respondent's notice of the charge itself to be of paramount consideration where the failure of notification is due to

agency negligence. *Cf. Watson v. Gulf & Western Indus.*, 650 F.2d 990, 993 (9th Cir.1981) (holding that the EEOC's failure to serve the charge on the respondent did not interfere with the plaintiff's rights). "'A Title VII complainant is not charged with the commission's failure to perform its statutory duties.'" *Id.* at 992 (quoting *Russell v. Am. Tobacco Co.*, 528 F.2d 357, 365 (4th Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976)). Any other rule would be inconsistent with the remedial purposes of the statute. Indeed, for the same remedial purposes, the plaintiff is permitted to assert in her civil complaint any claims reasonably related to her original theory of the case as it is made manifest the factual allegations of her charge. Title VII does not require that the plaintiff separately exhaust additional claims that are "so closely related [to the allegations made in the charge] that agency action would be redundant." *Sosa*, 920 F.2d at 1457 n.2 (internal quotation marks omitted).

██ If the charge itself is deficient in recording her theory of the case due to the negligence of an agency representative who completes the charge form, then the plaintiff may present her pre-complaint questionnaire as evidence that her claim for relief was properly exhausted. *See, e.g., Anthony v. County of Sacramento*, 898 F.Supp. 1435, 1443 n. 5 (E.D.Cal.1995) (holding that a pre-complaint questionnaire can be reviewed to determine the scope of an EEOC charge where the agency, in preparing the complaint, falsely abbreviated the plaintiff's theory of the case by "substantially condens[ing] and edit[ing] the plaintiff's complaint"); *Sickinger v. Mega Systems, Inc.*, 951 F.Supp. 153, 157–58 (N.D.Ind.1996) (holding that plaintiff could rely upon allegations made in her pre-complaint questionnaire for purposes of exhaustion where EEOC representative who typed the charge failed to include allegations of wrongful retaliation

that were clearly presented on the questionnaire); *see also Cheek v. W. & S. Life Ins., Co.*, 31 F.3d 497, 502 (7th Cir.1994) (determining that "[a]llegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations."). We are not persuaded by contrary authority, *e.g., Novitsky v. Am. Consulting Eng'rs*, 196 F.3d 699, 701–02 (7th Cir.1999), that a plaintiff must rely to her detriment on her charge even if the EEOC (or a state agency fulfilling its administrative function) has distorted her claims when transferring allegations from an intake questionnaire onto the charge form. Our own precedent takes a more deferential approach to the pre-complaint questionnaire. *See Casavantes v. Cal. State Univ., Sacramento*, 732 F.2d 1441, 1443 (9th Cir.1984) (permitting plaintiff to exhaust Title VII claims by completing a pre-complaint questionnaire within the statutory limitations period for filing a charge and supplementing the complaint with a sworn charge after the statute of limitations had run).

██ In the present case, Karl Sakamoto, the HCRC official who assisted Plaintiff, provided an affidavit stating that her Right to Sue Letter was intended by the agency to afford her the right to pursue claims of sexual as well as racial harassment. Although no explicit admission of agency negligence has been provided in the record, Sakamoto's declaration suggests that any deficiency in the charge regarding the sparseness of its factual allegations should be attributed to the agency itself rather than to Plaintiff, since the agency itself was on notice of Plaintiff's intent to pursue claims of sexual harassment and intended to provide her with an opportunity to do so. It is clear that someone at the agency typed the factual allegations in the charge on Plaintiff's behalf, and we cannot agree that if that

person was negligent in indicating the full scope of Plaintiff's allegations that the plaintiff herself should suffer due to that clerical error.

Although it is a close question, we conclude that, in light of the information in the pre-complaint questionnaire, the fact that Plaintiff checked boxes indicating a charge of sexual harassment, and the declaration of Karl Sakamoto, we should read the term "harassment" broadly where it appears in the factual allegations of Plaintiff's discrimination charge. We must keep in mind that complainants filing discrimination charges are acting as laypersons and should not be held to the higher standard of legal pleading by which we would review a civil complaint. *Kaplan,* 525 F.2d at 1359; *Green,* 883 F.2d at 1476. Though not as artfully as we might wish, Plaintiff was complaining about racial and sexual harassment in her charge. We therefore hold that her Title VII sexual harassment claim was properly exhausted.

The district court's ruling that limited Plaintiff to a state common law claim for sexual harassment with its limited remedies rather than allowing her state statutory claim to go forward, was clearly in error since Plaintiff gave notice in her complaint that she sought relief under the Hawaii antidiscrimination law. We note as did the district court that while Hawaiian antidiscrimination law contains its own exhaustion provisions, Haw.Rev.Stat. § 368–12, the Hawaii legislature has purposefully exempted victims of sexual harassment and sexual assault seeking relief under the state statute from having to file discrimination complaints with the HCRC before proceeding to trial, *see* Haw.Rev.Stat. § 378–3(10) ("Nothing in this part shall be deemed to ... [p]reclude any employee from bringing a civil action for sexual harassment or sexual assault and infliction of emotional distress or invasion of privacy related thereto...."). *See also Furukawa v. Honolulu Zoological Soc'y,* 85 Hawaii 7,

936 P.2d 643, 655 (1997). This purpose was recorded in a senate committee report. *See* Comm. Rep. No. 2588, Reg. Sess. (Senate Journal 1992) (stating that jurisdiction within the first 180 days after the alleged violation "rests primarily with the[HCRC] ...[,] however, after 180 days but within the tort statute of limitations, the employee may file a civil action in a court of competent jurisdiction whether or not notice of right to sue has been issued by the Commission pursuant to chapter 368"). The statute of limitations for tort actions regarding damage to persons or property under Hawaii law is two years from the date that the cause of action accrued. Haw.Rev.Stat. § 657–7. Plaintiff's state law claim for sexual harassment arose out of events beginning in 1995 and lasting through the fall of 1997. Her state court complaint of February 4, 1998 was therefore filed within the statute of limitations. We find that Plaintiff's state statutory claims of sexual harassment are preserved, and accordingly we reverse the district court's May 17, 1999 ruling.

### B. *Motion for Mistrial*

Plaintiff also appeals the district court's denial of her motion for a mistrial, claiming that Becraft's testimony was prohibited under Federal Rule of Evidence 412. Although the district court acknowledged its error in admitting Becraft's testimony relating to Plaintiff's sexual behavior, the court opted to strike the testimony and issue a curative instruction to the jury, and to issue sanctions against the County, rather than grant a new trial.

"Evidentiary rulings are reviewed for abuse of discretion and should not be reversed absent some prejudice." *Defenders of Wildlife v. Bernal,* 204 F.3d 920, 927–28 (9th Cir.2000); *see also S.M. v. J.K.,* 262 F.3d 914, 917 (9th Cir.2001) ("To reverse on the basis of an erroneous evidentiary ruling, we must conclude not only that the district court abused its discretion, but also that the error was prejudicial."). An erroneous evidentiary ruling

requires reversal of a jury verdict only where "a party's substantial rights were affected." *Beachy v. Boise Cascade Corp.,* 191 F.3d 1010, 1015 (9th Cir.1999) (quoting *Gilchrist v. Jim Slemons Imports, Inc.,* 803 F.2d 1488, 1500 (9th Cir.1986)). We review the district court's denial of Plaintiff's motion for a new trial for abuse of discretion. *Ruvalcaba v. City of Los Angeles,* 64 F.3d 1323, 1325 (9th Cir.1995).

As amended in 1994, Rule 412 forbids the admission of evidence of an alleged victim's "sexual behavior" or "sexual predisposition" in all "civil or criminal proceeding[s] involving alleged sexual misconduct" except under limited circumstances. Fed.R.Evid. 412(a). Significantly, the Advisory Committee Notes state that "the word 'behavior' should be construed to include activities of the mind, such as fantasies or dreams." Fed.R.Evid. 412, Advisory Committee Notes to 1994 Amendments ("Advisory Committee Notes"); *see also Sheffield v. Hilltop Sand & Gravel Co.,* 895 F.Supp. 105, 108 (E.D.Va.1995) (ruling that "[e]vidence relating to the plaintiff's [allegedly vulgar] speech is certainly evidence offered to prove an alleged victim's 'sexual predisposition'" and is therefore covered by Rule 412). The purpose of the amended rule is "to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." Advisory Committee Notes.

Rule 412's coverage extends over sexual harassment lawsuits. *Id.* ("Rule 412 applies in any civil case in which a person claims to be the victim of sexual misconduct, such as actions for sexual battery or sexual harassment."); *see also Wolak v. Spucci,* 217 F.3d 157, 160 (2d Cir.2000); *Excel Corp. v. Bosley,* 165 F.3d 635, 640–41 (8th Cir.1999); *Rodriguez–Hernandez v. Miranda–Velez,* 132 F.3d 848, 855–56 (1st

Cir.1998); *Barta v. City and County of Honolulu,* 169 F.R.D. 132, 134–35 (D.Haw. 1996); *Sheffield,* 895 F.Supp. at 109. Moreover, in a sexual harassment lawsuit as in any civil case, evidence offered to prove a victim's sexual behavior or sexual predisposition is admissible (if it is otherwise admissible) only if "its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." Fed.R.Evid. 412(b)(2). With respect to subsection (b)(2), the Advisory Committee Notes clarify that the balancing test to be employed in assessing whether to admit proposed evidence is "more stringent" than that governing Rule 403: "First, it Reverses that usual procedure ... by shifting the burden to the proponent to demonstrate admissibility rather than making the opponent justify exclusion of the evidence. Second, ... it raises the threshold for admission by requiring that the probative value of the evidence *substantially* outweigh the specified dangers. Finally, the Rule 412 test puts 'harm to the victim' on the scale in addition to prejudice to the parties." Advisory Committee Notes; *see also Rodriguez–Hernandez,* 132 F.3d at 856.

Unless the trial court permits an accommodation for good cause, a party seeking to introduce evidence covered by Rule 412 must file a motion, detailing the evidence and its purpose, no later than 14 days before the commencement of trial. Fed. R. Evid. 412(c)(1)(A). The moving party must serve the motion on all parties and give notice to the alleged victim. Fed. R.Evid. 412(c)(1)(B). "Before admitting evidence ... the court must conduct a hearing in camera and afford the victim and parties a right to attend and be heard." Fed.R.Evid. 412(c)(2). In the present case, defendants flouted these procedural guidelines. Having failed in two previous motions to obtain the court's approval to introduce Rule 412 material, the defendants instead simply sprang the of-

fending testimony upon the court and then misrepresented the nature of Becraft's testimony to the trial judge in response to plaintiff's objections that the defense intended to violate Rule 412.

The defendants offered Becraft's testimony in order to impugn Plaintiff's moral character and presumably also to establish that sexual advances by Tihada and sexual misconduct at the workplace were not unwelcome. *See* Fed.R.Evid. 412(b)(1)(B) (providing an exception to the Rule's general prohibitions for otherwise admissible evidence of "specific instances of sexual behavior by the alleged victim with respect to the person accused of the sexual misconduct offered by the accused to prove consent"). However, Becraft's testimony failed to recount any admissions by Plaintiff regarding Tihada's advances, and Plaintiff's alleged statements regarding her sexual habits were not probative as to the welcomeness of any harassing conduct by her coworkers.

 Furthermore, courts have held in similar cases that the probative value of evidence of a victim's sexual sophistication or private sexual behavior with regard to the welcomeness of harassing behavior in the workplace does not substantially outweigh the prejudice to her. For example, in *Wolak v. Spucci,* the Second Circuit held that evidence of a woman's out-of-work sexual experiences was improperly admitted under Rule 412. The defendants accused of sexual harassment had failed to establish that the probative value of the evidence substantially outweighed the danger of harm that it posed to the alleged victim. *See* 217 F.3d at 160–61(ruling that evidence that plaintiff had viewed pornography outside of the workplace did not exhibit a probative value substantially outweighing its prejudicial effect since plaintiff may still have been injured and her status altered by the displaying of porno-

graphic images at work). The Second Circuit stated that "[w]hether a sexual advance was welcome, or whether an alleged victim in fact perceived an environment to be sexually offensive, does not turn on the private sexual behavior of the alleged victim, because a woman's expectations about her work environment cannot be said to change depending upon her sexual sophistication." *Id.* at 160; *cf. Rodriguez-Hernandez,* 132 F.3d at 856 (upholding the district court's ruling that evidence concerning plaintiff's moral character and the marital status of her boyfriend were inadmissible under Rule 412, while evidence concerning plaintiff's allegedly flirtatious behavior toward the accused harasser was admissible to determine welcomeness). Here, because the alleged sexual behavior concerns the victim's fantasies or autoerotic sexual practices, the evidence is harmful and has no probative value.

 "A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate." *United States v. Berry,* 627 F.2d 193, 198 (9th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981); *accord Bayramoglu v. Estelle,* 806 F.2d 880, 888 (9th Cir.1986). In assessing whether the district court abused its discretion in refusing to grant a mistrial, "we must weigh the forcefulness of the instruction and the conviction with which it was given against the degree of prejudice generated by the evidence." *United States v. Johnson,* 618 F.2d 60, 62 (9th Cir. 1980). "In fixing the degree of prejudice, the probative force of the inadmissible evidence must be compared with that of the admissible evidence which supports the verdict." *Id.* We find that the district court's curative instruction was neither as forceful nor as comprehensive as warranted under the circumstances.[7] Furthermore, no matter

---

**7.** The district court also prefaced her remarks

by saying she was "just joking" that it was

what the instruction, it was impossible to dispel the effect of Becraft's lurid and prejudicial testimony. Because we believe that the defendants both flouted the procedural requirements of Rule 412 and failed to establish that the probative value of Becraft's testimony substantially outweighed its prejudicial effect, we reverse the ruling of the district court and remand for a new trial.

### C. *Award of Sanctions against County of Maui*

■ The County cross-appeals the district court's imposition of sanctions in response to its Rule 412 violation. The district court's award of sanctions and the amount of the award are reviewed for abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). In awarding sanctions against the County of Maui, the district court stated "that the County was not entirely forthcoming in the way that this [matter surrounding Becraft's testimony] was presented to me." In particular, the court cited the fact that defense counsel had previously brought two pretrial motions (both of which were denied) to permit them to introduce Rule 412 material, in conformity with the rule's requirement that motions be brought at least fourteen days in advance of trial and that an in camera hearing be held to determine admissibility. Fed.R.Evid. 412(c). As a result, in the district court's view, defense counsel "knew in general that I was not sympathetic to attempts to bring in [Plaintiff]'s sexual history. And the—manner in which that side bar colloquy went forward contributed somewhat to my feeling that what was likely to come out, even if it was of a sexual nature, probably was not other sexual behavior. I had assumed, incor-

rectly, as it turns out, that it was going to be a comment by [Plaintiff] that Officer Becraft would discuss concerning her attitude towards Lanny Tihada. And I have already indicated that that, it seems to me, does not fall within Rule 412."

The district court concluded that defense counsel had been more than reckless with regard to the requirements of the Rule. The trial judge stated that counsel had demonstrated "knowledge of the rule and the applicable law and recklessness in the face of such undeniable knowledge." *Cf. Sheffield*, 895 F.Supp. at 109 (sanctioning defendant for "its callous disregard of the procedural safeguards articulated in Rule 412(c)"). Although the court declined to conclude that defense counsel had acted in "bad faith," it found counsel's conduct to be deserving of sanctions under both 28 U.S.C. § 1927 and the court's inherent power. Accordingly, the district court imposed $5,000 in sanctions under § 1927 for attorneys' fees, and another $5,000 under the court's inherent powers to compensate Plaintiff for the emotional damage caused by the improper testimony.

On appeal, the County argues that the district court abused its discretion in deciding to impose sanctions under § 1927. Specifically, the County contends that mere recklessness is insufficient under the law to impose sanctions, and that recklessness plus knowledge adds up to nothing more than recklessness, since all attorneys are presumed to know the law. Furthermore, the County contends that absent a showing of bad faith, sanctions under the court's inherent power also cannot be justified, much less for compensatory damages to the plaintiff.

We are convinced that the district court clearly erred in stopping short of explicitly

---

almost lunchtime, by way of apologizing for keeping the jury waiting for much of the morning. This jocular tone may have dimin-

ished the forcefulness of her curative instruction.

finding that the defendant's lawyers acted in bad faith. Given that defense counsel had had two such motions denied before trial, it is implausible that counsel was not cognizant of Rule 412's pre-trial motion requirement, or that counsel was unaware of the evident conflict between the substance of Becraft's testimony and Rule 412's terms (and Advisory Committee Notes). Defense counsel's sidebar statement to the district court just prior to Becraft's testimony—that "[i]t's not going to get into any issue of sexual acts between Officer Plaintiff and this man"—was highly misleading. We cannot help but conclude that defense counsel's introduction of Becraft's testimony was a knowing and intentional violation of Rule 412.

### 1. 28 U.S.C. § 1927

■ Pursuant to 28 U.S.C. § 1927, "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Here defense counsel's misconduct multiplied the proceedings by prompting the motion for a mistrial and the subsequent imposition of sanctions. Furthermore, this was done in an unreasonable and vexatious manner.

To be sure, our cases have been less than a model of clarity regarding whether a finding of mere recklessness alone may suffice to impose sanctions for attorneys' fees. For example, in *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir.1983), we held that § 1927 sanctions require a finding of recklessness *or* bad faith. *See also Barber v. Miller*, 146 F.3d 707, 711 (9th Cir.1998) ("An award of sanctions under 28 U.S.C. § 1927 or the district court's

inherent authority requires a finding of recklessness or bad faith.").

■ However, we have also held that "section 1927 sanctions must be supported by a finding of subjective bad faith," which "is present when an attorney knowingly or recklessly raises a *frivolous* argument, or argues a meritorious claim for the purpose of harassing an opponent." *In re Keegan Mgmt. Co., Sec. Lit.*, 78 F.3d 431, 436 (9th Cir.1996) (internal quotations omitted) (emphasis added). Thus, "[f]or sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass.... [R]eckless nonfrivolous filings, without more, may not be sanctioned." *Id.* Analyzed under *Keegan*, then, the question here becomes whether the district court's finding of recklessness *plus knowledge* suffices to merit § 1927 sanctions.

■ Our most recent pronouncement on the proper legal standard for § 1927 sanctions comes from the case of *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir.2001). In *Fink*, we reconciled *Blodgett, Keegan* and *Barber* by holding that "recklessness suffices for § 1927, but bad faith is required for sanctions under the court's inherent power." *Id.* Hence, under *Fink*, we conclude that the district court's finding of recklessness plus knowledge was sufficient to justify the imposition of § 1927 sanctions.[8]

### 2. Court's Inherent Power

■ We also affirm the district court's decision with respect to the sanctions awarded to Plaintiff under the court's inherent powers. In *Chambers v. NASCO, Inc.*, the Supreme Court reinforced the longstanding principle that "[c]ourts of justice are universally acknowledged to be

---

**8.** In any event, because we find that defense counsel's Rule 412 argument *was* frivolous inasmuch as it lacked credibility on its face, we conclude that the § 1927 sanctions were justified even under the *Keegan* standard.

vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." 501 U.S. at 43, 111 S.Ct. 2123 (internal quotation marks omitted). Significantly, under our controlling cases, conduct that is "tantamount to bad faith" is sanctionable. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). As we recently stated in *Fink,* "[f]or purposes of imposing sanctions under the inherent power of the court, a finding of bad faith does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees." 239 F.3d at 992 (internal quotation marks omitted). In sum, "sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith. Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose. Therefore ... an attorney's reckless misstatements of law and fact, when coupled with an improper purpose, ... are sanctionable under a court's inherent power." *Id.* at 994.

■■■■ Here, regardless of whether defense counsel's behavior constituted bad faith *per se,* we readily find that counsel's reckless *and* knowing conduct in this case was tantamount to bad faith and therefore sanctionable under the court's inherent power. If left unsanctioned, defense counsel's behavior in this case would undermine the very purpose and force of Rule 412's strictures. Thus, we believe the district court's resort to its inherent powers to sanction the County was eminently reasonable and justified.

■■■■ To be sure, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123. However, "[a] primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45, 111 S.Ct. 2123. In disingenuously circumventing both the spirit and the letter of Rule 412, we believe that defense counsel abused the judicial process, making the imposition of sanctions appropriate.

The County argues that sanctions for compensatory damages to Plaintiff are unprecedented and beyond the scope of the court's inherent power. And yet, in *Chambers,* the Court delineated a broad range of situations for which a variety of sanctions were deemed appropriate, and noted that even outright dismissal of a lawsuit lies within the court's inherent power. The Court therefore reasoned that the "less severe sanction" of an assessment of attorneys fees was well within the court's authority as well. *Id.* at 43–45, 111 S.Ct. 2123. Similar logic applies here, particularly given that none of the other federal rules or statutes govern the situation. *See id.* at 50, 111 S.Ct. 2123 ("[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

"The imposition of sanctions ... transcends a court's equitable power concerning relations between the parties and reaches *a court's inherent power to police itself,* thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's [misbehavior]." *Id.* at 46, 111 S.Ct. 2123 (emphasis added) (internal quotations omitted). The award of compensatory damages to Plaintiff for the County's misconduct therefore does not

appear unreasonable in this regard. Contrary to the County's position, by imposing sanctions for the embarrassment and pain suffered by Plaintiff as a result of the improper testimony, the district court was not invading the province of the jury or providing a substantive remedy to an aggrieved party. Instead, the amount the court imposed reflected its assessment of the actual harm incurred by Plaintiff, both in terms of additional attorneys' fees and emotional and reputational damage. This was well within the bounds of the court's discretionary power.

## CONCLUSION

Rule 412 "aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual predisposition." Advisory Committee Notes. Defense counsel's egregious conduct in introducing Becraft's testimony subverted the fundamental purpose of Rule 412 and deprived Plaintiff of a fair trial. We therefore hold that the district court abused its discretion in denying Plaintiff's motion for a mistrial and affirm the award of sanctions against the County of Maui.

We also hold that the district court erred in dismissing Plaintiff's Title VII sexual harassment claims for failure to exhaust, and that her sexual harassment claims under Haw. Rev. Stat. § 378 have no exhaustion requirement and are therefore preserved. Plaintiff is entitled to her costs on appeal. We remand for a new trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL.**